UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :        **INDICTMENT**

            - v. -                    :        11 Cr.

MARK MAZER,                           :
DIMITRY ARONSHTEIN,
SVETLANA MAZER,                       :
LARISA MEDZON, and
ANNA MAKOVETSKAYA,                    :

            Defendants.               :

- - - - - - - - - - - - - - - x



### Overview of the Schemes

1.   From at least in or about 2005 to in or about 2010, MARK MAZER, the defendant, while serving as an agent and representative of the City of New York (the "City"), and of the Office of Payroll Administration ("OPA"), a City agency, used his position of power and influence at OPA, and the assistance of DIMITRY ARONSHTEIN, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, among others, to illegally enrich himself and his family members and associates by demanding kickbacks from OPA vendors, defrauding the City in various other ways, and working with associates to launder the proceeds of the criminal scheme, and thereby exposed the City to millions of dollars in financial losses.

2.   MARK MAZER, the defendant, orchestrated a kickback scheme while serving as a manager on the CityTime

information technology project ("CityTime"), a payroll system modernization initiative that was originally budgeted to cost $63 million to complete, but has cost the City approximately $700 million to date, with additional expenditures required to complete the project.  MARK MAZER recommended, and was among the individuals who approved on behalf of the City, contract amendments for the software development vendor hired by the City to develop CityTime (the "Lead Software Developer") that contributed to the dramatic increase in the cost of the project, and that called for the City to hire dozens of new consultants to perform the work called for by the contract amendments.  MARK MAZER used his power and influence to cause many consultants, including many of the consultants hired as a result of the contract amendments he recommended and/or approved, to be hired by a subcontractor on the Citytime project ("Subcontractor-1") through two staffing companies, D.A. Solutions, Inc. ("DAS") and Prime View, Inc. ("Prime View") (collectively, the "Sub-Subcontractors").  MARK MAZER then solicited millions of dollars in kickbacks - totaling approximately 80% of the net revenue generated by the Sub-Subcontractors - from DIMITRY ARONSHTEIN, the defendant, who owned DAS, and Victor Natanzon, who owned Prime View, from the revenue generated by these new consultants.  ARONSHTEIN and Natanzon paid the kickbacks solicited by MARK MAZER in the

form of checks to shell companies, bulk cash, and other means intended to conceal their illegal payments to MAZER.

3.   MARK MAZER, the defendant, among others, also defrauded the City, among other means, by approving for payment timesheets of consultants that he knew had been fired or were on leave.  Those payments increased the revenue generated by the Sub-Subcontractors, and consequently, the size of the kickbacks received by MAZER.  MAZER also deprived the City of the right to control its assets by withholding material facts, and by making material misrepresentations, in dealings with the City.

4.   Once proceeds of the kickbacks and fraud were paid, MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, working with others, used a network of shell companies, and hundreds of financial transactions, to conceal the illegal origin of the proceeds, to distribute the proceeds, and to promote the carrying on of the criminal schemes.

## Entities and Individuals Involved in the Scheme

5.   The City: The City is the largest municipality in the United States.  It employs over 250,000 workers and, in Fiscal Year 2010 ("FY10"), which ran from July 1, 2009 to June 30, 2010, spent over $20 billion in wages and salaries.  In FY10, the City obtained over $8 billion in federal grant

funding, a large percentage of which was spent on wages and salaries of City employees who administer federally-funded programs.  The City received multi-billion dollar infusions of federal funds in prior years, spending large portions of the funds on wages and salaries in those years as well.

6.   OPA: OPA is charged with, among other things, ensuring that the City maintains timely and accurate employee and retiree payrolls; issuing paychecks or other forms of payment to employees and retirees; ensuring the continued security, integrity, and effectiveness of the City's payroll systems; and managing and reconciling the City's payroll accounts.  In that capacity, OPA is responsible for safeguarding federal funds that are directed to the City each year and used to pay wages and salaries to City employees who administer federally-funded programs.

7.   CityTime: The CityTime project is an information technology initiative intended to create a secure, web-based system for monitoring and recording time and attendance by City employees.  As referenced above, the City contracted with the Lead Software Developer to develop the CityTime system and implement it at City agencies.  The Lead Software Developer in turn contracted with Subcontractor-1 to staff the CityTime project.  While the initial Lead Software Developer contract to develop CityTime was for $63 million,

-4-

the current amount issued to the Lead Software Developer for
CityTime-related services was over $628 million as of
September 2010.

        8.   The Quality Assurance Vendor: in 2001, OPA
contracted with a national consulting firm (the "QA Vendor")
to provide quality assurance ("QA") services for the CityTime
project.  The City initially directed the QA Vendor to
supervise the Lead Software Developer's performance, and to
ensure that the ultimate product created by the Lead Software
Developer would meet the City's needs.  Soon thereafter, the
City's contract with the QA Vendor was amended to permit OPA
to retain the services of subject-matter experts ("SMEs"),
through the QA Vendor, to assist with active day-to-day
management of the CityTime project.  Overall, since 2001 and
as of September 2010, there have been 11 amendments to the
contract with the QA Vendor, and payments to the QA Vendor
have exceeded $49 million.

        9.   Mark Mazer: MARK MAZER, the defendant, was
hired in or about 2004 as a SME to assist with management and
supervision of the CityTime project in order to ensure, among
other things, that the City received good value for the
services being rendered by the Lead Software Developer.

        a.   MARK MAZER was paid by the City for work
purportedly performed as a SME as follows: The QA Vendor

billed the City for work purportedly performed by MARK MAZER
as a SME.  MARK MAZER in turn was paid by the QA Vendor, which
routed these payments to a company that MARK MAZER owned
called MS Creative Technologies ("MS Creative").  Other SMEs
were also hired by OPA and paid via MS Creative at the request
of MARK MAZER.  In total, the QA Vendor paid over $4.4 million
to MS Creative for work purportedly performed by MARK MAZER
and other SMEs paid through MS Creative.

        b.   While MARK MAZER was not an employee of
the City or of OPA while working as a SME on the CityTime
project, he served as an agent of OPA, including as a manager
and representative of OPA, during times relevant to this
Indictment.  Evidence of MARK MAZER's agency status includes,
but is not limited to, the following:

        i.   MARK MAZER was described, treated,
and authorized to act as an OPA manager by others at OPA.  As
an OPA manager, MARK MAZER was given authority to approve time
sheets submitted by consultants working on the CityTime
project on behalf of the City.  Some time sheets approved by
MARK MAZER reflect that MARK MAZER was described on these
documents as an OPA manager.

        ii.   MARK MAZER had an OPA email account
issued by the City, which he used to communicate with others
concerning the CityTime project.

-6-

iii. As reflected by minutes prepared of regular status meetings concerning the CityTime project, MARK MAZER attended the status meetings not as a representative of the QA Vendor or the Lead Software Developer, but as a representative of OPA.

iv.  MARK MAZER was given managerial authority by OPA to recommend that certain contract amendments be accepted or rejected, subject to final approval by the Executive Director of OPA (the "Executive Director"), with whom MARK MAZER had a close personal and professional relationship.

v.   MARK MAZER was authorized to represent OPA in visits to, and dealings with, other City agencies.

10. Dimitry Aronshtein and DAS: DIMITRY ARONSHTEIN, the defendant, is the uncle of MARK MAZER, the defendant, and the brother of LARISA MEDZON, the defendant.  At all times relevant to this Indictment, ARONSHTEIN owned DAS, which had minimal income before MARK MAZER caused DAS to be hired to provide staffing services for the CityTime project in or about 2005.  DAS received over $55 million in consulting fees from the CityTime project between 2005 and 2010, representing almost 100 percent of its income during that time.

11.  <u>Victor Natanzon and Prime View</u>:  At all times
relevant to this Indictment, Victor Natanzon owned Prime View.
Prime View had prior clients and income, but that income
increased dramatically when MARK MAZER caused Prime View to be
hired to provide staffing services for the CityTime project in
or about 2005.  Prime View received over $21 million in
consulting fees from the CityTime project between 2005 and
2010, representing approximately 75 percent of its income
during that time.

12.  <u>The First- and Second-Tier Shells</u>: MARK MAZER,
SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the
defendants, established and maintained a network of shell
companies.  These defendants used bank accounts and safe
deposit boxes held in their names, and in the names of the
shell companies, to launder the proceeds of the fraud and
kickback scheme summarized above.  Three of the shell
companies, "MAS Solutions, Inc." ("MAS"); SJM Services, Inc.
("SJM"), and Front Line Consulting Corp." ("Front Line")
(collectively, the "First-Tier Shells") received money
directly from the Sub-Subcontractors.  A second set of shell
companies, including MS Advantage Group, LLC ("MS Advantage")
and MS Development Services Corp. ("MS Development")
(collectively, the "Second-Tier Shells"), received funds from

the First-Tier shells and from other sources that were derived
from the criminal scheme.

    13.  <u>Svetlana Mazer, Larisa Medzon, and Anna</u>
<u>Makovetskaya</u>: SVETLANA MAZER, LARISA MEDZON, and ANNA
MAKOVETSKAYA, the defendants, are relatives of MARK MAZER, the
defendant, who assisted with the laundering of proceeds of the
criminal scheme.  SVETLANA MAZER is MARK MAZER's wife; LARISA
MEDZON is MARK MAZER's mother; and ANNA MAKOVETSKAYA is MARK
MAZER's distant cousin.  Among other things, SVETLANA MAZER
owns or controls, with MARK MAZER, bank accounts in the names
of the Second-Tier Shells; MEDZON owns or controls bank
accounts in the name of First-Tier Shells SJM and Front Line;
and MAKOVETSKAYA owns or controls bank accounts in the name of
First-Tier Shell MAS.

              **Means and Methods of the Fraud and Kickback Scheme**

    14.  The fraud and kickback scheme summarized above
operated as follows, in pertinent part:

              a.  MARK MAZER, the defendant, used his power
and influence at OPA to affect the City's decision to
dramatically increase staffing and expenditures on the
CityTime project.  MARK MAZER then caused the Sub-
Subcontractors to be hired to provide staffing services for
the CityTime project.

b.    MARK MAZER informed DIMITRY ARONSHTEIN and
Victor Natanzon that in exchange for receiving contracts to
provide staffing services on the CityTime project, as well as
other benefits, including access to potential future work with
the City and other entities, they would be required to pay
MARK MAZER large kickbacks.  For example, MARK MAZER informed
Victor Natanzon that Natanzon would have to pay 80 percent of
his gross profits to MARK MAZER, leaving only 20 percent of
the profits for Natanzon.  Over time, MARK MAZER came to
demand an even larger share of the profits generated by the
Sub-Subcontractors.  For example, beginning in or about 2008,
Natanzon was required to pay MARK MAZER $5,000 or more in bulk
cash kickbacks on a regular basis, over and above the 80
percent kickbacks, as a condition of maintaining Prime View's
position as a staffing provider for the CityTime project.
Between in or about 2005 and December 2010, the kickbacks paid
to MARK MAZER by ARONSHTEIN and Natanzon amounted to over $25
million dollars.

c.    MARK MAZER also engaged in efforts to
defraud the City and, among other things, generate more income
for himself by increasing the amount of money paid to the Sub-
Subcontractors and then back to him in the form of kickbacks.
MARK MAZER completed and submitted forms required of certain
City vendors as part of the City's Vendor Information Exchange

System ("VENDEX") that contained material misrepresentations and omissions. These misrepresentations and omissions included, among other things, failing to answer truthfully and completely questions that would have revealed his ownership and beneficial interests in the First- and Second-Tier Shells, and his hidden interests in the monies paid to the Sub-Subcontractors, had he provided truthful and complete answers to those questions. MARK MAZER also made material misrepresentations and omissions to individuals working at OPA and on the CityTime project concerning his financial interest in the funds paid to the Sub-Subcontractors, among other things. These material misrepresentations and omissions, among other fraudulent statements and conduct, deprived the City of the right to control its assets and exposed the City to the risk of loss of substantial amounts of money and property.

d.   Among other things, MARK MAZER exposed the City to the risk of financial loss by using his power and influence at OPA, and his role as an agent, manager, and representative of OPA, by developing and recommending approval for contract amendments calling for large increases in expenditures on the CityTime project, including expenditures that flowed to the Sub-Subcontractors and on to MARK MAZER himself. MARK MAZER was also responsible for hiring and

-11-

supervising many of the consultants hired through the Sub-Subcontractors as a result of the contract amendments.   At least some of the staffing increases recommended and implemented by MARK MAZER were not necessary for the successful completion of the CityTime project, but instead served as a vehicle for MARK MAZER to increase his proceeds from the criminal scheme.

e.   MARK MAZER also, among other things, fraudulently caused consultants hired by the Sub-Subcontractors to be paid by the City even while they were on leave or after they had been fired, even though he knew that the Sub-Subcontractors were not permitted to bill the City for consultants' severance or leave.   In his role as an OPA manager and agent, MARK MAZER fraudulently approved timesheets seeking payment by the City for hours not actually worked by consultants.   Revenues for these fraudulent timesheets were routed through the Sub-Subcontractors, and a substantial portion of those revenues were kicked back to MARK MAZER.

f.   MARK MAZER requested that ARONSHTEIN and Natanzon pay the kickbacks in a manner that was intended to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the criminal scheme, and ARONSHTEIN and Natanzon agreed to pay the kickbacks in the surreptitious manner requested by MARK MAZER.

-12-

ARONSHTEIN and Natanzon, for example, agreed to distribute the kickbacks to the First-Tier Shells so that it appeared as if the Sub-Subcontractors had hired the First-Tier Shells to perform work for them.  Natanzon also, for example, withdrew cash in amounts of $5,000 or greater from banks in New Jersey and Manhattan, and delivered the bulk cash to MARK MAZER or another co-conspirator not named herein ("CC-1") in Manhattan in order to pay supplemental kickbacks requested by MARK MAZER.  ARONSHTEIN also agreed to send wire transfers of funds to foreign bank accounts in order to launder the proceeds of the scheme for MARK MAZER.

g.   MARK MAZER furthered the scheme in part through the use of numerous telephone calls, emails, and transfers of funds through interstate wires.

### Statutory Allegations

### COUNT ONE

(Wire Fraud)

The Grand Jury charges:

15.   The allegations contained in paragraphs 1-14 of this Indictment are repeated and realleged as if fully set forth herein.

16.   From at least in or about 2005, up to and including 2010, in the Southern District of New York and elsewhere, MARK MAZER, the defendant, unlawfully, willfully

-13-

and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, numerous interstate electronic transfers of funds were sent that furthered the scheme, and MARK MAZER sent and received numerous emails that traveled interstate, and engaged in numerous interstate telephone conversations, that furthered the scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO

(Conspiracy)

The Grand Jury further charges:

17.   The allegations contained in paragraphs 1-14 of this Indictment are repeated and realleged as if fully set forth herein.

18.   From at least in or about 2005, up to and including in or about 2010, in the Southern District of New York and elsewhere, MARK MAZER and DIMITRY ARONSHTEIN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate,

-14-

and agree together and with each other to commit offenses against the United States, to wit: violations of Title 18, United States Code, Sections 666(a)(1)(B), 666(a)(2), and 1952.

19.   It was a part and object of the conspiracy that, during the time when MARK MAZER, the defendant, was an agent, manager, and representative of a local government and an agency thereof, to wit, the City and OPA, MARK MAZER unlawfully, willfully, knowingly and corruptly, would and did solicit and demand for the benefit of a person, and accept and agree to accept, something of value from DIMITRY ARONSHTEIN, the defendant, Victor Natanzon, and others known and unknown, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency, involving something of value of $5,000 and more, said government and agency receiving, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(1)(B).

20.   It was further a part and an object of the conspiracy that DIMITRY ARONSHTEIN, the defendant, Victor Natanzon, and others known and known, unlawfully, willfully, knowingly and corruptly would and did give, offer, and agree

-15-

to give something of value to MARK MAZER, the defendant, and

others known and unknown, with intent to influence and reward

an agent, manager, and representative of a local government

and an agency thereof, to wit, OPA, in connection with

business, transaction, or series of transactions of such

government and agency involving something of value of $5,000

and more, said government and agency receiving, in a one-year

period, benefits in excess of $10,000 under a Federal program

involving a grant, contract, subsidy, loan, guarantee,

insurance and other form of Federal assistance, in violation

of Title 18, United States Code, Section 666(a)(2).

     21.  It was further a part and object of the

conspiracy that MARK MAZER and DIMITRY ARONSHTEIN, the

defendants, and others known and unknown, unlawfully,

willfully, and knowingly would and did travel in interstate

commerce, and use and cause to be used the mail and facilities

in interstate and foreign commerce, with the intent to

distribute the proceeds of an unlawful activity, and to

promote, manage, establish, carry on and facilitate the

promotion, management, establishment and carrying on of an

unlawful activity, to wit, the offering and acceptance of

commercial bribes in violation of New York Penal Law Sections

180.00 and 180.05, and thereafter would and did perform and

attempt to perform an act to distribute the proceeds of said

-16-

unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

<u>Overt Acts</u>

22.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about May 2, 2006, DIMITRY ARONSHTEIN, the defendant, transferred $30,750.90 in fraud proceeds by international wire to a bank account in Latvia via a bank located in New York, New York.

b.   In or about the Fall of 2010, Victor Natanzon delivered $20,000 in cash from New Jersey to MARK MAZER, the defendant, in New York, New York.

(Title 18, United States Code, Section 371.)

**<u>COUNT THREE</u>**

(Bribery)

The Grand Jury further charges:

23.  The allegations contained in paragraphs 1-14 of this Indictment are repeated and realleged as if fully set forth herein.

24.  From at least in or about 2005 to in or about
2010, in the Southern District of New York and elsewhere,
during the time when MARK MAZER, the defendant, was an agent,
manager, and representative of a local government and an
agency thereof, MARK MAZER unlawfully, willfully, knowingly
and corruptly, solicited and demanded for the benefit of a
person, and accepted and agreed to accept, something of value
from another person, intending to be influenced and rewarded
in connection with a business, transaction, and series of
transactions of such government and agency, involving
something of value of $5,000 and more, said government and
agency receiving, in a one-year period, benefits in excess of
$10,000 under a Federal program involving a grant, contract,
subsidy, loan, guarantee, insurance and other form of Federal
assistance, to wit, MARK MAZER, while an agent, manager, and
representative of the City and OPA, solicited and accepted
millions of dollars in bribes and kickbacks from vendors in
exchange for helping these vendors receive work on the
CityTime Project.

(Title 18, United States Code, Section 666(a)(1)(B).)

## COUNT FOUR

(Bribery)

The Grand Jury further charges:

25.  The allegations contained in paragraphs 1-14 of this Indictment are repeated and realleged as if fully set forth herein.

26.  From at least in or about 2005 up to and including in or about 2010, in the Southern District of New York and elsewhere, DIMITRY ARONSHTEIN, the defendant, unlawfully, willfully, knowingly and corruptly did give, offer, and agree to give something of value to another person, with intent to influence and reward an agent of a local government and an agency thereof, in connection with a business, transaction, or series of transactions of such government and agency involving something of value of $5,000 and more, said government and agency receiving, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance, to wit, ARONSHTEIN paid more than $10 million in bribes and kickbacks to MARK MAZER, an agent of the City and of OPA, in exchange for receiving work on the CityTime project.

(Title 18, United States Code, Section 666(a)(1)(B)).

-19-

## COUNT FIVE

(Travel Act Violation)

The Grand Jury further charges:

27.   The allegations contained in paragraphs 1-14 of this Indictment are repeated and realleged as if fully set forth herein.

28.   From at least in or about 2005 up to and including in or about 2010, in the Southern District of New York and elsewhere, MARK MAZER and DIMITRY ARONSHTEIN, the defendants, unlawfully, willfully, and knowingly did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, the offering and acceptance of commercial bribes in violation of New York Penal Law Sections 180.00 and 180.05, and thereafter did perform, attempt to perform, and aid and abet the performance of, an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, to wit, MARK MAZER and ARONSHTEIN used cellphones, among other instrumentalities of interstate

commerce, in furtherance of the bribery and kickback scheme
charged in Counts Two, Three and Four of this Indictment.

(Title 18, United States Code, Sections 1952(a)(1) and (a)(3),
and 2.)

### COUNT SIX

(Money Laundering Conspiracy)

The Grand Jury further charges:

29.  The allegations contained in paragraphs 1-28 of
this Indictment are repeated and realleged as if fully set
forth herein.

30.  From at least in or about 2005 up to and
including in or about 2010, in the Southern District of New
York and elsewhere, MARK MAZER, DIMITRY ARONSHTEIN, the
defendants, Victor Natanzon, and others known and unknown,
unlawfully, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, to
violate Title 18, United States Code, Section
1956(a)(1)(B)(i).

31.  It was a part and an object of the conspiracy
that MARK MAZER, DIMITRY ARONSHTEIN, the defendants, Victor
Natanzon, and others known and unknown, in an offense
involving and affecting interstate and foreign commerce,
knowing that the property involved in certain financial
transactions represented the proceeds of some form of unlawful
activity, unlawfully, willfully, and knowingly would and did

-21-

conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud, conspiracy, bribery and Travel Act violations alleged in Counts One through Five of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Overt Acts

32.   In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about May 2, 2006, DIMITRY ARONSHTEIN, the defendant, transferred $30,750.90 in fraud proceeds by international wire to a bank account in Latvia via a bank account located in New York, New York.

b.   On or about March 26, 2009, MARK MAZER, the defendant, received a $30,000 wire transfer from a bank account in Latvia via a bank account located in New York, New York to a bank account in the name of a shell company that he owned.

(Title 18, United States Code, Section 1956(h).)

## COUNT SEVEN

(Money Laundering Conspiracy)

The Grand Jury further charges:

## The Conspiracy to Launder Proceeds through Shell Companies and Other Means

33.  The allegations contained in paragraphs 1-32 of this Indictment are repeated and realleged as if fully set forth herein.

34.  Funds generated by the fraud and kickback crimes described above were deposited into the First-Tier Shells, delivered in bulk cash, and/or wired abroad by MARK MAZER and DIMITRY ARONSHTEIN, the defendants, and Victor Natanzon, among others.  As noted above, over $25 million in illegal proceeds were generated as a result of this criminal conduct.  Once the funds were received in this manner, MARK MAZER and co-conspirators needed to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the criminal scheme, to promote the carrying on of the scheme, and to transfer money among accounts established to facilitate the scheme, to store proceeds of the scheme, and to distribute proceeds to MARK MAZER and his family members, and associates.  To achieve these objectives, MARK MAZER worked with SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, to

engage in the following conduct, among other things, that
enabled the proceeds of the funds to be laundered:

       a.   MARK MAZER, SVETLANA MAZER, LARISA MEDZON,
and ANNA MAKOVETSKAYA, the defendants, established the First-
and Second-Tier Shells (collectively, the "Shell Companies").

       b.   MARK MAZER, SVETLANA MAZER, LARISA MEDZON,
and ANNA MAKOVETSKAYA, the defendants, disguised MARK MAZER's
links to the Shell Companies, and to the funds flowing into
the Shell Companies, by among other things, listing
themselves, but not MARK MAZER, as signatories on many of the
bank accounts established in the names of the Shell Companies,
even though they engaged in numerous financial transactions,
including transactions of $10,000 or greater, at the request
of MARK MAZER.  SVETLANA MAZER also filed VENDEX
questionnaires with the City that contained material
misstatements and omissions in order to further disguise her
links, and those of MARK MAZER, to the Shell Companies.

       c.   MARK MAZER, SVETLANA MAZER, LARISA MEDZON,
and ANNA MAKOVETSKAYA, the defendants, established bank
accounts in the names of these shell companies at numerous
banks.  These defendants made false and misleading statements,
and omitted material facts, in their statements to and filings
with the banks holding accounts in the names of the Shell
Companies.  For example, the defendants falsely stated, in

-24-

application materials related to the bank accounts opened in
the names of Shell Companies, that the accounts were needed by
a business engaged in, among other things, information
technology consulting activities, when in fact, the accounts
were used to receive and distribute proceeds of criminal
conduct.  MAKOVETSKAYA also provided false information
concerning MAS to an employee of a bank ("Bank-1") conducting
a "know your customer" interview concerning accounts opened in
the name of MAS that was intended to, among other things,
prevent Bank-1's accounts for being used for money laundering
activities.

       d.    MARK MAZER, SVETLANA MAZER, LARISA
MEDZON, and ANNA MAKOVETSKAYA, the defendants, engaged in, and
aided and abetted others engaged in, numerous financial
transactions, including numerous transactions involving
$10,000 and more of crime proceeds, that concealed and
disguised the nature, the location, the source, the ownership
and the control of the proceeds of the criminal scheme,
promoted the carrying on of the scheme, and transferred money
among accounts established to facilitate the scheme.
Transactions included hundreds of ATM transactions; transfers
of funds by check and wire transfer; deposits of bulk cash
into safe deposit boxes; and transfers of funds to establish
purported retirement accounts in the names of the Shell

Companies, and to purchase, among other things, homes and
other assets.  MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and
ANNA MAKOVETSKAYA, the defendants, also personally enjoyed
proceeds of the criminal scheme, receiving hundreds of
thousands of dollars or greater from the proceeds of the
criminal conduct described above into bank accounts held in
their names.

### Statutory Allegation

    35.  From at least in or about 2005 up to and
including in or about 2010, in the Southern District of New
York and elsewhere, MARK MAZER, SVETLANA MAZER, LARISA MEDZON,
and ANNA MAKOVETSKAYA, the defendants, and others known and
unknown, unlawfully, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other,
to violate Title 18, United States Code, Sections
1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 1957(a).

    36.  It was a part and an object of the conspiracy
that MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and ANNA
MAKOVETSKAYA, the defendants, and others known and unknown, in
an offense involving and affecting interstate and foreign
commerce, knowing that the property involved in certain
financial transactions represented the proceeds of some form
of unlawful activity, unlawfully, willfully, and knowingly
would and did conduct and attempt to conduct such financial
transactions which in fact involved the proceeds of specified

unlawful activity, to wit, the wire fraud, conspiracy, bribery and Travel Act violations alleged in Counts One through Five of this Indictment, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

37. It was further a part and an object of the conspiracy that MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud, conspiracy, bribery and Travel Act violations alleged in Counts One through Five of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

38. It was further a part and an object of the conspiracy that MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and

ANNA MAKOVETSKAYA, the defendants, and others known and unknown, within the United States and involving United States persons, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did engage and attempt to engage in monetary transactions in criminally-derived property of a value greater than $10,000 that is derived from specified unlawful activity, to wit, the wire fraud, conspiracy, bribery and Travel Act violations alleged in Counts One through Five of this Indictment, in violation of Title 18, United States Code, Section 1957(a).

<u>Overt Acts</u>

39.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about March 26, 2009, MARK MAZER, the defendant, received a $30,000 transfer from a bank account in Latvia via a bank account in New York, New York to a bank account in the name of a shell company that he owned.

b.   In or about June 2010, SVETLANA MAZER, the defendant, submitted fraudulent VENDEX questionnaire responses to the City of New York in New York, New York.

c.   On or about January 22, 2010, LARISA MEDZON, the defendant, withdrew over $6000 in cash via multiple ATM transactions at multiple banks in New York.

d.   In or about April 2006, ANNA MAKOVETSKAYA, the defendant, while in New York, New York, provided false information to an employee of Bank-1 in response to questions during a "Know Your Customer" interview.

(Title 18, United States Code, Section 1956(h).)

### FORFEITURE ALLEGATION: COUNTS ONE THROUGH FIVE

40.   As a result of committing one or more of the offenses alleged in Counts One through Five of the Indictment, MARK MAZER and DIMITRY ARONSHTEIN, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the said offenses.

<u>Substitute Asset Provision</u>

41.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

-29-

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.)

## FORFEITURE ALLEGATION: COUNTS SIX AND SEVEN

42.  As the result of committing the money laundering offenses alleged in Counts Six and Seven of this Indictment, MARK MAZER, DIMITRY ARONSHTEIN, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offense and all property traceable to such property.

### Substitute Asset Provision

43.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

-30-

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants, up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1956.)


_____
FOREPERSON


_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MARK MAZER,
DIMITRY ARONSHTEIN,
SVETLANA MAZER,
LARISA MEDZON, and
ANNA MAKOVETSKAYA,

Defendants.

## INDICTMENT

11 Cr.

(18 U.S.C. §§ 371, 666, 1343, 1952, 1956
& 2.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

2/10/11  Filed Indictment  Case assigned to J. Daniels.
A/W issued

Ihetz
U.S.M.J