UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :      **SUPERSEDING INDICTMENT**

            - v. -               :      S2 11 Cr. 121 (GBD)

MARK MAZER,                       :
GERARD DENAULT,                   :
PADMA ALLEN,                      :
REDDY ALLEN,                      :
TECHNODYNE LLC,                   :
DIMITRY ARONSHTEIN,               :
SVETLANA MAZER,                   :
LARISA MEDZON, and                :
ANNA MAKOVETSKAYA,                :

            Defendants.

- - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/17/11

## COUNT ONE

### (Conspiracy To Defraud the City of New York)

The Grand Jury charges:

### Background

1.    For over ten years, the City of New York (the
"City") has been developing and attempting to implement an
initiative to modernize the payroll system for City employees
called the CityTime Project ("CityTime").  CityTime was
originally budgeted to cost the City $63 million to complete,
but, in fact, has cost the City approximately $700 million to
date, with potential additional expenditures that will be
required to complete the project.

<u>New York City's Oversight of CityTime</u>

2.   At all times relevant to this Indictment, the New York City Office of Payroll Administration ("OPA") was the City agency responsible for overseeing CityTime.  OPA is the City agency charged with maintaining, managing, and administering payroll for City employees and retirees.  OPA is responsible for safeguarding the billions of dollars of federal funds that are directed to the City each year and that the City uses to pay wages and salaries to certain City employees administering federally-funded programs.

3.   MARK MAZER, the defendant, was hired by an outside consulting firm to serve as a "subject matter expert" to advise the City in connection with CityTime.  MARK MAZER was ultimately given authority to serve as a principal agent and representative of OPA in connection with the CityTime project.  Among other things, MARK MAZER had the authority to approve consultants' time sheets; represent OPA at meetings related to CityTime; and make recommendations to accept or reject amendments to contracts on the CityTime Project.  MARK MAZER reported directly to the executive director of OPA, with whom MAZER had a close personal and professional relationship.

### The Primary Contractor

4.   Science Applications International Corporation ("SAIC") was the primary contractor hired by the City to develop and implement CityTime.  Between at least 2003 and 2010, the City disbursed well over $600 million to SAIC in connection with CityTime.

5.   GERALD DENAULT, the defendant, was an employee of SAIC who served, from at least 2003 up to and including 2010, as SAIC's Program Manager on CityTime.  Among other things, DENAULT was responsible for selecting and overseeing subcontractors hired by SAIC to assist with CityTime; submitting bills to the City seeking payment for work purportedly performed by SAIC employees and subcontractors on CityTime; and developing proposed CityTime work orders and contract amendments seeking approval for SAIC to perform additional work on CityTime.

6.   Carl Bell worked as Chief Systems Engineer in the New York office of SAIC from 2003 up to 2011.  Among other things, Bell was initially responsible for the development of the software for CityTime and oversaw technical aspects of SAIC's work on CityTime.

### The Primary Subcontractor

7.   TECHNODYNE LLC ("TECHNODYNE"), the defendant, was the primary subcontractor employed by SAIC to provide

-3-

staffing services on the CityTime Project.  TECHNODYNE is a
private consulting company based in New Jersey that is wholly
owned by REDDY ALLEN and PADMA ALLEN, the defendants.  At all
times relevant to this Indictment, REDDY ALLEN, the defendant,
served as Chief Executive Officer of TECHNODYNE, and PADMA
ALLEN, the defendant, served as Chief Financial Officer of
TECHNODYNE.  Between 2003 up to and including 2010, SAIC
agreed to pay TECHNODYNE at least $450 million in connection
with CityTime.

<u>The Sub-subcontractors</u>

8.   D.A. Solutions, Inc. ("DAS") was a sub-
subcontractor hired by TECHNODYNE to provide additional
staffing services on the CityTime Project.  Between 2005 and
2010, DAS received over $55 million in consulting fees on the
CityTime Project, representing almost 100 percent of its
income during that time period.  DIMITRY ARONSHTEIN, the
defendant, was the owner of DAS, as well as the uncle of MARK
MAZER, the defendant, and the brother of LARISA MEDZON, the
defendant.

9.   Prime View, Inc. ("Prime View") was another
sub-subcontractor hired by TECHNODYNE to provide additional
staffing services in connection with CityTime.  Between 2006
and 2010, Prime View received over $20 million in consulting
fees on the CityTime Project, representing over 75 percent of

its income during that time period.  Victor Natanzon was the
owner of Prime View.

## Overview of the Fraudulent Scheme

10.  From at least in or about 2003 up to and
including at least in or about 2010, there existed a massive
and elaborate scheme to defraud New York City in connection
with the CityTime Project.  The individuals primarily
responsible for the CityTime Project -- exploiting their
authority and influence over OPA, the primary contractor
(SAIC), the primary subcontractor (Technodyne), and the sub-
subcontractors (DAS and Prime View) -- collaborated to
overbill the City and otherwise defraud the City in order to
illegally enrich themselves.  As a result, virtually the
entirety of the well over $600 million that the City paid to
SAIC on the CityTime Project was tainted, directly or
indirectly, by fraud.

11.  More specifically, MARK MAZER, GERARD DENAULT,
PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, Carl
Bell, and others known and unknown, conspired to defraud the
City and did so as follows:

a.  They agreed to make material
misrepresentations and material omissions to the City in order
to cause the City to spend significantly more money than
necessary on CityTime in order to increase their illicit

profits.  Among other things, they defrauded the City into:
(1) hiring consultants not needed to complete the project; (2)
inflating the rates charged for work performed by certain
consultants; and (3) inflating the hours worked by certain
consultants.

      b.   They agreed to the payment of millions of
dollars of kickbacks to individuals whose participation was
critical to the success of the fraudulent scheme.  For
example, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE paid at
least $9 million in kickbacks to DENAULT and at least $5
million in kickbacks to Bell to ensure the continued success
of the fraudulent scheme.  Meanwhile, DIMITRY ARONSHTEIN, the
defendant, and Victor Natanzon paid MARK MAZER over $25
million in kickbacks so that MARK MAZER would continue to
steer sub-subcontracting work to their respective companies,
DAS and Prime View.

      c.   They agreed to launder their respective
corrupt proceeds using, among other means, shell companies and
bank accounts located in the United States and abroad.

### The Organization of the Fraudulent Scheme

12.  In or about 2003, GERARD DENAULT, the
defendant, and Carl Bell recommended that SAIC hire
TECHNODYNE, the defendant, whose principal, REDDY ALLEN, the
defendant, had previously worked with DENAULT and Bell.  SAIC

-6-

agreed and in turn hired TECHNODYNE to provide staffing for
CityTime.  SAIC hired and retained TECHNODYNE as a "sole
source" contractor, meaning that TECHNODYNE did not have to
engage in a competitive bidding process to win the contract
with SAIC, nor did TECHNODYNE have to engage in a competitive
bidding process to be awarded additional CityTime business by
SAIC.

        13.  At or around the time that SAIC hired
TECHNODYNE, the defendant, to work on the CityTime Project,
REDDY ALLEN, PADMA ALLEN, and TECHNODYNE, the defendants,
agreed to pay kickbacks to GERARD DENAULT, the defendant, and
Carl Bell.  Specifically, REDDY ALLEN, PADMA ALLEN, and
TECHNODYNE agreed to pay DENAULT and Bell each $5 for every
hour worked by every consultant hired by or through TECHNODYNE
to work on the CityTime Project.  This kickback arrangement
provided DENAULT and Bell with a significant personal
financial incentive to inflate the billing for consultants on
CityTime.

        14.  In or around 2005, MARK MAZER and GERARD
DENAULT, the defendants, among others, caused REDDY ALLEN,
PADMA ALLEN, and TECHNODYNE, the defendants, to hire DAS as a
sub-subcontractor on the CityTime Project.  The following
year, MARK MAZER and DENAULT, among others, caused REDDY
ALLEN, PADMA ALLEN, and TECHNODYNE to hire Prime View.  In

exchange for receiving work on the CityTime Project, DIMITRY
ARONSHTEIN, the owner of DAS and MARK MAZER's uncle, and
Victor Natanzon, the owner of Prime View, agreed to pay
kickbacks to MARK MAZER at MARK MAZER's request.  For example,
MARK MAZER demanded that Natanzon pay to MARK MAZER 80% of
Prime View's profits on CityTime, and Natanzon agreed.  Over
time, MARK MAZER demanded, and Natanzon agreed to pay, an even
larger share of Prime View's profits.  This kickback
arrangement provided MARK MAZER with a significant personal
financial incentive to inflate the billing for consultants on
CityTime.

      15.  MARK MAZER, REDDY ALLEN, PADMA ALLEN, and
TECHNODYNE, the defendants, agreed that TECHNODYNE would pay
GERARD DENAULT, the defendant, an additional $2 for every hour
billed by a consultant working for any sub-subcontractor
paying kickbacks to MARK MAZER, namely, DAS, as of 2005, and
Prime View beginning in 2006.  This kickback arrangement
provided DENAULT with an additional personal financial
incentive to inflate the billing for consultants on CityTime.

      16.  In or about 2005 and 2006, after the City had
already paid SAIC approximately $85 million for its work on
CityTime, MARK MAZER and GERARD DENAULT, the defendants, among
others, advocated for an amendment to SAIC's CityTime
contract.  Specifically, they recommended that the City change

-8-

SAIC's contract from a "fixed price" contract, in which SAIC bore the responsibility of absorbing cost overruns, to a "fixed price level of effort" contract, so that the City, and not SAIC, would largely become responsible for future cost overruns.  The City ultimately amended SAIC's contract as MARK MAZER, DENAULT, and others had recommended.

      17.  Following the 2006 contract amendment, staffing on the CityTime project expanded dramatically.  At the end of 2005, there were fewer than 150 consultants working on the project, and an internal SAIC report prepared in 2005 by DENAULT, the defendant, stated that the program at that time was staffed adequately to meet both current and projected contract needs.  By the end of 2007, however, the number of consultants had more than doubled, to more than 300 -- the vast majority of whom were hired and paid through SAIC's subcontract with TECHNODYNE, the defendant.  The City was billed for many of these consultants at rates that exceeded $160 per hour, or more than $300,000 per year.  Additionally, between 2006 and 2010, as the number of consultants working on CityTime grew, SAIC paid TECHNODYNE hundreds of millions of dollars despite the fact that SAIC, in 2005, had received a whistleblower complaint and conducted an internal investigation concerning allegations regarding overuse of

TECHNODYNE, contract mismanagement, and suspicions of kickbacks to GERARD DENAULT, the defendant.

18.   By April 2010, the City had agreed to pay SAIC approximately $628 million for CityTime.  According to SAIC internal reports, TECHNODYNE, the defendant, was paid or scheduled to be paid $464 million, or 74 percent of the total amount paid to SAIC, as compensation for providing "staff augmentation" to SAIC on the CityTime project.  All other SAIC subcontractors and vendors combined were to receive less than 14 percent of the total amount paid to SAIC for work on the CityTime project.  The $464 million to be paid to TECHNODYNE represented approximately 80 percent of Technodyne's income between 2003 and 2010.  As a result of the funds paid by SAIC to TECHNODYNE, TECHNODYNE appeared to be a successful and fast-growing company.  Indeed, in 2010, PADMA ALLEN, the defendant, was honored as an Entrepreneur of the Year by a prominent firm.  In truth and in fact, however, the vast majority of TECHNODYNE's business and the engine of its growth was business it secured from SAIC in exchange for paying kickbacks to SAIC executives -- GERARD DENAULT, the defendant, and Bell -- and for agreeing to hire sub-subcontractors paying kickbacks to MARK MAZER, the defendant.

## The Execution of the Fraudulent Scheme

19.   In an effort to defraud the City and, in so doing, increase (a) the amount of kickbacks paid to MARK MAZER and GERARD DENAULT, the defendants, as well as to Carl Bell, and (b) the purportedly legitimate business of PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, MARK MAZER, DENAULT, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, Carl Bell, and others known and unknown, made and agreed to make a series of material misrepresentations and material omissions to cause the City to overpay for the CityTime Project.  Among these material misrepresentations and material omissions were the following:

a.   In certain forms submitted to the City as part of the City's Vendor Information Exchange System ("VENDEX"), MARK MAZER failed to answer truthfully and completely questions that would have revealed, among other things, his interests in the shell corporations that received kickbacks from DAS and Prime View.

b.   MARK MAZER approved requests for payment submitted to the City for work allegedly performed by consultants working for DAS and Prime View when, in truth and in fact, and as MAZER well knew, the consultants were on leave, the consultants had been fired, and/or the consultants

-11-

were reporting more hours of work than they had actually performed.

c.    MARK MAZER and DENAULT recommended that the 2006 contract amendment described above -- which caused the City, not SAIC, to absorb the cost of overruns on CityTime -- was necessary to the successful completion of CityTime and was in the City's interest.

d.    DENAULT used his position of authority at SAIC to, among other things, (1) approve contract amendments and work orders calling for large increases in expenditures on the CityTime project devoted to the hiring of additional consultants, even though many of the staffing increases were not necessary for the successful completion of the project; (2) cause the vast majority of new consultants to be hired through TECHNODYNE; (3) cause the hiring of consultants at billing rates that were too high for their levels of skills and experience; and (4) artificially slow and delay the deployment and implementation of the project.

e.    In certain VENDEX forms, PADMA ALLEN failed to answer truthfully and completely questions that would have revealed, among other things, her authority over certain entities affiliated with TECHNODYNE that she, REDDY ALLEN, and TECHNODYNE used to perpetrate the fraud.

## The Concealment of the Fraudulent Scheme

20.  MARK MAZER, GERARD DENAULT, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, Carl Bell, and others known and unknown, took steps to conceal the proceeds of their fraud on the City.

21.  To conceal the kickbacks they were receiving from PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, GERARD DENAULT, the defendant, and Carl Bell each took steps to make it appear as though the kickbacks they were receiving constituted legitimate income from a separate consulting business.  Specifically, in or about 2004, Bell created a shell company called "3C Enterprises," and DENAULT created a bank account in the name of "MKG Consulting."  Between in or about 2004 and in or about 2010, DENAULT received at least $9 million in kickbacks through MKG Consulting, and during this same period of time, Bell received at least $5 million in kickbacks through 3C Enterprises.

22.  To conceal the kickbacks they were paying to GERARD DENAULT, the defendant, and Carl Bell, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, wired money to bank accounts they controlled in India in the name of other companies affiliated with TECHNODYNE.  Specifically, from 2004 through 2011, at the direction of PADMA ALLEN, TECHNODYNE wired approximately $38 million to bank accounts in India in

-13-

the name of a company called McCreade Software Asia Pvt. Ltd.
("McCreade"). Also at PADMA ALLEN's direction, TECHNODYNE
wired more than $12 million to a company called Kaveri
International Inc. ("Kaveri") which in turn wired more than $2
million to McCreade and to a second company in India, Srihari
Exports Pvt. Ltd. ("Srihari"). Another individual ("Co-
Conspirator 1"), who had a close relationship with PADMA
ALLEN, was, at all time relevant to this Indictment, a
signatory to both McCreade's and Srihari's bank accounts.
McCreade and Srihari, in turn, wired the kickbacks paid by
TECHNODYNE to accounts controlled by DENAULT and Bell in the
names of, respectively, MKG Consulting and 3C Enterprises.
The kickbacks were disguised on many of the wire transfers as
payments for "Consulting Services."  In truth and in fact,
however, and as PADMA ALLEN, REDDY ALLEN, and TECHNODYNE well
knew, the payments were not for any consulting services but
were kickbacks to DENAULT and Bell.

     23.  To conceal the kickbacks he was receiving from
DAS and Prime View, MARK MAZER, the defendant, directed
DIMITRY ARONSHTEIN, the defendant, and Victor Natanzon, to
distribute the kickbacks to a network of shell companies MARK
MAZER controlled called "MAS Solutions, Inc." ("MAS"); SJM
Services, Inc. ("SJM"), and Front Line Consulting Corp."
("Front Line") (collectively, the "First-Tier Shells").  The

First-Tier Shells were established and maintained by MARK MAZER and certain of his relatives, namely, LARISA MEDZON, his mother, and ANNA MAKOVETSKAYA, his cousin, the defendants. MARK MAZER, MEDZON, and MAKOVETSKAYA in turn sent millions of dollars to a second set of shell companies controlled by MARK MAZER and his wife, the defendant, SVETLANA MAZER (the "Second-Tier Shells").  The payments from DAS and Prime View to the First-Tier Shells were designed to make it appear as if DAS and Prime View had hired the First-Tier Shells to perform actual work for them.  Natanzon also, for example, withdrew cash in amounts of $5,000 or greater from banks in New Jersey and Manhattan, and delivered the bulk cash to MARK MAZER or another co-conspirator not named herein ("Co-Conspirator 2") in Manhattan in order to pay supplemental kickbacks requested by MARK MAZER.  ARONSHTEIN also agreed to send wire transfers of funds to foreign bank accounts in order to launder the proceeds of the scheme for MARK MAZER.

### Statutory Allegations

24.  From at least in or about 2003, up to and including in or about 2011, in the Southern District of New York and elsewhere, GERARD DENAULT, MARK MAZER, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit

wire fraud in violation of Title 18, United States Code, Section 1343.

25.   It was a part and an object of the conspiracy that GERARD DENAULT, MARK MAZER, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property from the City of New York (the "City") by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, including interstate and foreign wire transfers, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, DENAULT, MAZER, TECHNODYNE, PADMA ALLEN and REDDY ALLEN, together with others known and unknown, defrauded the City into significantly overpaying for the CityTime project.

<u>Overt Acts</u>

26.   In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

-16-

      a.    On or about December 6, 2007, MARK MAZER, the defendant, sent an email to officials at OPA approving a work order that expanded the number of consultants on the CityTime project.

      b.    In or about 2005 and 2006, GERARD DENAULT, the defendant, recommended that the City amend its contract with SAIC so that the City, and not SAIC, would largely absorb the cost of future overruns on the CityTime Project.

      c.    On or about November 6, 2006, TECHNODYNE, the defendant, wired approximately $400,000 in funds originally disbursed by the City from TECHNODYNE's bank account in New Jersey to a bank account of DAS in New York.

      (Title 18, United States Code, Section 1349.)

## COUNT TWO

(Wire Fraud)

The Grand Jury further charges:

      27.    The allegations contained in paragraphs 1-23 of this Indictment are repeated and realleged as if fully set forth herein.

      28.    From at least in or about 2005, up to and including 2010, in the Southern District of New York and elsewhere, MARK MAZER, GERARD DENAULT, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, willfully and knowingly, having devised and intending to devise a scheme and

artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MAZER, DENAULT, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE perpetrated and aided and abetted the fraudulent scheme described in Count One of this Indictment.

       29.  Among others, the following wire transfers furthered the scheme:

        a.   On or about November 6, 2006, TECHNODYNE, the defendant, wired approximately $400,000 in funds originally disbursed by the City from TECHNODYNE's bank account in New Jersey to a bank account of DAS in New York.

        b.   On or about August 8, 2008, GERARD DENAULT, the defendant, received a kickback payment agreed to by PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, in the amount of approximately $76,000, and which was sent to a bank account DENAULT controlled in Connecticut from a bank account in India controlled by PADMA ALLEN, via a wire transfer through New York, New York.

      (Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE

(Conspiracy To Commit Honest Services Fraud)

The Grand Jury further charges:

30.   The allegations contained in paragraphs 1-23 of this Indictment are repeated and realleged as if fully set forth herein.

31.   It is a violation of SAIC policy for an employee to participate in any private business or professional activity or have any direct or indirect financial interest that would create a conflict between their private interests and their responsibilities to SAIC.

32.   On at least one occasion, in or about December 2005, GERARD DENAULT, the defendant, falsely certified to SAIC's procurement department that there were no conflict of interest issues associated with DENAULT's recommendations to provide work to TECHNODYNE on the CityTime project.  In truth and in fact, and as DENAULT well knew, he had already received and expected to continue receiving lucrative kickbacks from PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, in connection with the CityTime work he helped steer to TECHNODYNE.

33.   As a result of the concealed kickbacks paid by PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, to DENAULT, the defendant, and to Carl Bell, TECHNODYNE received

-19-

hundreds of millions of dollars in revenues from SAIC for work purportedly performed on the CityTime project.

### Statutory Allegations

34.   From at least in or about 2003, up to and including at least in or about 2011, in the Southern District of New York and elsewhere, GERARD DENAULT, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346.

35.   It was a part and an object of the conspiracy that GERARD DENAULT, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive DENAULT's and Carl Bell's employer, SAIC, of its intangible right to DENAULT's and Bell's honest services, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, including interstate and foreign wire transfers, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, DENAULT, while working as SAIC's Program Manager

on the CityTime project, and Bell, while working as Chief
Systems Engineer in the New York office of SAIC, received
millions of dollars in concealed kickbacks from TECHNODYNE
that were agreed to and arranged by PADMA ALLEN and REDDY
ALLEN in exchange for receiving millions of dollars of work
from SAIC on the CityTime project.

<u>Overt Act</u>

36.  In furtherance of said conspiracy and to effect
the illegal object thereof, the following overt act, among
others, was committed in the Southern District of New York and
elsewhere:

a.  On or about August 8, 2008, GERARD
DENAULT, the defendant, received a kickback payment agreed to
by TECHNODYNE, PADMA ALLEN and REDDY ALLEN, the defendants, in
the amount of approximately $76,000, and which was sent to a
bank account DENAULT controlled in Connecticut from a bank
account in India controlled by PADMA ALLEN, via a wire
transfer through New York, New York.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR

(Honest Services Fraud)

The Grand Jury further charges:

37.   The allegations contained in paragraphs 1-23 and 31-33 of this Indictment are repeated and realleged as if fully set forth herein.

38.   From at least in or about 2003, up to and including at least in or about 2011, in the Southern District of New York and elsewhere, GERARD DENAULT, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive DENAULT's employer SAIC of its intangible right to DENAULT's honest services, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, including interstate and foreign wire transfers, for the purpose of executing such scheme and artifice, to wit, DENAULT, while working as SAIC's Program Manager on the CityTime project, received millions of dollars in concealed kickbacks from TECHNODYNE in exchange for receiving work from SAIC on the CityTime project.

39.   Among others, the following wire transfer furthered the scheme:

a.    On or about August 8, 2008, GERARD
DENAULT, the defendant, received a kickback payment agreed to
by PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants,
in the amount of approximately $76,000, and which was sent to
a bank account DENAULT controlled in Connecticut from a bank
account in India controlled by PADMA ALLEN, via a wire
transfer through New York, New York.

(Title 18, United States Code, Sections 1343 and 1346.)

### COUNT FIVE

(Conspiracy To Commit Bribery)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1-23 of
this Indictment are repeated and realleged as if fully set
forth herein.

41.   From at least in or about 2005, up to and
including in or about 2010, in the Southern District of New
York and elsewhere, MARK MAZER, GERARD DENAULT, PADMA ALLEN,
REDDY ALLEN, TECHNODYNE, and DIMITRY ARONSHTEIN, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree
together and with each other to commit offenses against the
United States, to wit, violations of Title 18, United States
Code, Sections 666(a)(1)(B) and 666(a)(2).

-23-

42.   It was a part and object of the conspiracy
that, during the time when MARK MAZER, the defendant, was an
agent, manager, and representative of a local government and
an agency thereof, to wit, the City and OPA, MARK MAZER
willfully, knowingly and corruptly, would and did solicit and
demand for the benefit of a person, and accept and agree to
accept, something of value from PADMA ALLEN, REDDY ALLEN,
TECHNODYNE, and DIMITRY ARONSHTEIN, the defendants, Victor
Natanzon, and others known and unknown, intending to be
influenced and rewarded in connection with a business,
transaction, and series of transactions of such government and
agency, involving something of value of $5,000 and more, said
government and agency receiving, in a one-year period,
benefits in excess of $10,000 under a Federal program
involving a grant, contract, subsidy, loan, guarantee,
insurance and other form of Federal assistance, in violation
of Title 18, United States Code, Section 666(a)(1)(B).

43.   It was further a part and an object of the
conspiracy that PADMA ALLEN, REDDY ALLEN, TECHNODYNE, and
DIMITRY ARONSHTEIN, the defendants, along with Victor Natanzon
and others known and unknown, willfully, knowingly and
corruptly would and did give, offer, and agree to give
something of value to MARK MAZER, the defendant, and others
known and unknown, with intent to influence and reward an

-24-

agent, manager, and representative of a local government and
an agency thereof, to wit, OPA, in connection with a business,
transaction, or series of transactions of such government and
agency involving something of value of $5,000 and more, said
government and agency receiving, in a one-year period,
benefits in excess of $10,000 under a Federal program
involving a grant, contract, subsidy, loan, guarantee,
insurance and other form of Federal assistance, in violation
of Title 18, United States Code, Section 666(a)(2).

<u>Overt Act</u>

44.   In furtherance of the conspiracy and to effect
the illegal objects thereof, the following overt act, among
others, was committed in the Southern District of New York and
elsewhere:

a.   On or about May 2, 2006, DIMITRY
ARONSHTEIN, the defendant, transferred $30,750.90 by
international wire to a bank account in Latvia via a bank
located in New York, New York.

b.   In or about 2005, MARK MAZER and GERARD
DENAULT, the defendants, with the agreement of PADMA ALLEN,
REDDY ALLEN, and TECHNODYNE, the defendants, caused DAS to be
hired as a subcontractor to TECHNODYNE to provide additional
staffing services on the CityTime project.

(Title 18, United States Code, Section 371.)

## COUNT SIX

(Bribery)

The Grand Jury further charges:

45.   The allegations contained in paragraphs 1-23 of this Indictment are repeated and realleged as if fully set forth herein.

46.   From at least in or about 2005 up to and including in or about 2010, in the Southern District of New York and elsewhere, during the time when MARK MAZER, the defendant, was an agent, manager, and representative of a local government and an agency thereof, MARK MAZER willfully, knowingly and corruptly, solicited and demanded for the benefit of a person, and accepted and agreed to accept, something of value from another person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency, involving something of value of $5,000 and more, said government and agency receiving, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance, to wit, MARK MAZER, while an agent, manager, and representative of the City and OPA, solicited and accepted millions of dollars in bribes

and kickbacks from vendors in exchange for helping these vendors receive work on the CityTime Project.

(Title 18, United States Code, Section 666(a)(1)(B).)

## COUNT SEVEN

(Bribery)

The Grand Jury further charges:

47.  The allegations contained in paragraphs 1-19 and 35-36 of this Indictment are repeated and realleged as if fully set forth herein.

48.  From at least in or about 2005 up to and including in or about 2010, in the Southern District of New York and elsewhere, PADMA ALLEN, REDDY ALLEN, TECHNODYNE, and DIMITRY ARONSHTEIN, the defendants, willfully, knowingly and corruptly did give, offer, and agree to give something of value to another person, with intent to influence and reward an agent of a local government and an agency thereof, in connection with a business, transaction, or series of transactions of such government and agency involving something of value of $5,000 and more, said government and agency receiving, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance, to wit, MARK MAZER, an agent of the City and OPA, directed PADMA ALLEN, REDDY ALLEN, and TECHNODYNE to steer

work on CityTime to ARONSHTEIN who, in turn, paid millions of dollars in bribes and kickbacks to MARK MAZER.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT EIGHT

(Conspiracy to Violate the Travel Act)

The Grand Jury further charges:

49. The allegations contained in paragraphs 1-23 and 31-33 of this Indictment are repeated and realleged as if fully set forth herein.

50. From at least in or about 2005, up to and including in or about 2010, in the Southern District of New York and elsewhere, MARK MAZER, GERARD DENAULT, PADMA ALLEN, REDDY ALLEN, TECHNODYNE, and DIMITRY ARONSHTEIN, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.

51. It was further a part and object of the conspiracy that MARK MAZER, GERARD DENAULT, PADMA ALLEN, REDDY ALLEN, TECHNODYNE, and DIMITRY ARONSHTEIN, the defendants, and others known and unknown, willfully and knowingly would and did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign

commerce, with the intent to distribute the proceeds of an
unlawful activity, and to promote, manage, establish, carry on
and facilitate the promotion, management, establishment and
carrying on of an unlawful activity, to wit, the offering and
acceptance of commercial bribes in violation of New York Penal
Law Sections 180.00 and 180.05, and thereafter would and did
perform and attempt to perform an act to distribute the
proceeds of said unlawful activity, and to promote, manage,
establish, carry on, and facilitate the promotion, management,
establishment, and carrying on of said unlawful activity, in
violation of Title 18, United States Code, Sections 1952(a)(1)
and (a)(3).

<u>Overt Acts</u>

52.   In furtherance of the conspiracy and to effect
the illegal object thereof, the following overt acts, among
others, were committed in the Southern District of New York
and elsewhere:

a.   In or about the Fall of 2010, Victor
Natanzon delivered $20,000 in cash from New Jersey to MARK
MAZER, the defendant, in New York, New York.

b.   On or about May 2, 2006, DIMITRY
ARONSHTEIN, the defendant, transferred $30,750.90 by
international wire to a bank account in Latvia via a bank
located in New York, New York.

c.    On or about August 8, 2008, GERARD
DENAULT, the defendant, received a kickback payment agreed to
by PADMA ALLEN, REDDY ALLEN, and TECHNODYNE, the defendants,
in the amount of approximately $76,000, and which was sent to
a bank account DENAULT controlled in Connecticut from a bank
account in India controlled by PADMA ALLEN, via a wire
transfer through New York, New York.

(Title 18, United States Code, Section 371.)

## COUNT NINE

(Obstruction of Justice)

The Grand Jury further charges:

53.   The allegations contained in paragraphs 1-23
and 31-33 of this Indictment are repeated and realleged as if
fully set forth herein.

54.   In or about December 2010, in the Southern
District of New York and elsewhere, GERARD DENAULT, the
defendant, did knowingly, intentionally and corruptly attempt
to obstruct, influence and impede an official proceeding, to
wit, a proceeding before a Federal grand jury in the Southern
District of New York, by, among other things, misleading law
enforcement agents about the fraud and kickback schemes
described above, and his knowledge of and involvement with
DAS.

(Title 18, United States Code, Section 1512(c)(2)).

-30-

## COUNT TEN

(Obstruction of Justice Conspiracy)

The Grand Jury further charges:

55.  The allegations contained in paragraphs 1-23 of this Indictment are repeated and realleged as if fully set forth herein.

56.  In or about January 2011, PADMA ALLEN, the defendant, made statements to federal and local law enforcement officials.  In her interview, ALLEN stated that TECHNODYNE's business transactions with affiliated entities, including Kaveri and McCreade, were entirely proper and had legitimate business purposes.  In truth and in fact, however, and as PADMA ALLEN well knew, many of TECHNODYNE's transactions with Kaveri and McCreade were wire transfers of funds made to conceal the payments of kickbacks to GERARD DENAULT, the defendant, and Carl Bell.

57.  Also in or about December 2010 and January 2011, at a time when they knew that they and TECHNODYNE, the defendant, were under federal investigation, PADMA ALLEN and REDDY ALLEN, the defendants, provided Carl Bell with documents setting forth, in detail, a false account that Bell could provide if law enforcement questioned him about the payments he received from McCreade and Srihari.  Specifically, REDDY ALLEN met with Carl Bell and provided Bell with a typewritten

document containing suggested false talking points for Bell.
Among them were the statements that in "late 1997," Bell
"[c]halked out a plan to help assist [McCreade]"; that Bell
received "[n]o upfront payment but royalties payment"; that
the "[m]ajority of the work was performed during off hours and
weekends…and between full time jobs"; and that the "[g]o to
market for the various products and solutions was planned in
2001…but due to global market crash…the launch was delayed to
late 2002…sales started in 2003….after which royalty payments
began to get processed." At or around this time, PADMA ALLEN
also gave Bell a handwritten document in further support of
the false cover story that REDDY ALLEN had suggested to Bell.
The document that PADMA ALLEN provided to Bell listed contact
names for McCreade and Srihari; stated that the "PERIOD OF
PERFORMANCE" was "NOV 1997 TO MAY 2001"; and stated that the
"NATURE OF SERVICES PERFORMED" was "TECHNOLOGY STRATEGY,
PRODUCT ROAD MAP[,] PRODUCT SOLUTIONS CONSULTING[,] VARIOUS
PRODUCTS - FOR MEDIA + ENT, PUBLISHING, RECRUITING
INDUSTRIES." PADMA ALLEN's handwritten document also
specified that the "PAYMENT TERMS" were "FOR ROYALTIES ON
FUTURE SALE OF PRODUCTS + USAGE." In truth and in fact, and
as PADMA ALLEN and REDDY ALLEN well knew, there was not at any
time a plan for Carl Bell to receive any "royalties" from
McCreade, Srihari, Kaveri or TECHNODYNE, the defendant, and

Carl Bell did not provide McCreade, Srihari, Kaveri or
TECHNODYNE with technology strategy or other services from
November 1997 through May 2001.  Rather, Bell received
millions of dollars of kickbacks from in or about 2003 through
in or about 2011 from PADMA ALLEN, REDDY ALLEN, and
TECHNODYNE.

     58.  In or about February 2011, while under subpoena
by a federal grand jury, PADMA ALLEN and REDDY ALLEN, the
defendants, left the United States for India and have remained
in India since that time.  From in or about January 2011 to in
or about June 2011, many of TECHNODYNE's operations and
personnel were transferred from the United States to India.

### Statutory Allegation

     59.  In or about January 2011, in the Southern
District of New York and elsewhere, PADMA ALLEN and REDDY
ALLEN, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together and with each other, to violate Title 18, United
States Code, Section 1512(c)(2).

     60.  It was a part and an object of the conspiracy
that PADMA ALLEN and REDDY ALLEN, the defendants, did
knowingly, intentionally and corruptly attempt to obstruct,
influence and impede an official proceeding, to wit, a
proceeding before a Federal grand jury in the Southern

District of New York, by, among other things, providing Carl
Bell with a false cover story suggesting that the kickbacks
paid by TECHNODYNE to him and GERARD DENAULT, the defendant,
were not kickbacks related to work on the CityTime project.

(Title 18, United States Code, Section 1512(k)).

## COUNT ELEVEN

(Money Laundering Conspiracy)

The Grand Jury further charges:

61.  The allegations contained in paragraphs 1-23
and 31-33 of this Indictment are repeated and realleged as if
fully set forth herein.

62.  From at least in or about 2003 up to and
including in or about 2011, in the Southern District of New
York and elsewhere, GERARD DENAULT, PADMA ALLEN, REDDY ALLEN,
and TECHNODYNE, the defendants, Carl Bell, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, to
violate Title 18, United States Code, Section
1956(a)(1)(B)(i).

63.  It was a part and an object of the conspiracy
that GERARD DENAULT, PADMA ALLEN, REDDY ALLEN, and TECHNODYNE,
the defendants, Carl Bell, and others known and unknown, in an
offense involving and affecting interstate and foreign
commerce, knowing that the property involved in certain

-34-

financial transactions represented the proceeds of some form
of unlawful activity, willfully, and knowingly would and did
conduct and attempt to conduct such financial transactions
which in fact involved the proceeds of specified unlawful
activity, to wit, the offenses described in Counts One through
Eight of this Indictment, knowing that the transactions were
designed in whole and in part to conceal and disguise the
nature, the location, the source, the ownership and the
control of the proceeds of specified unlawful activity, in
violation of Title 18, United States Code, Section
1956(a)(1)(B)(i), to wit, DENAULT, PADMA ALLEN, REDDY ALLEN,
and TECHNODYNE agreed that DENAULT's kickbacks would be
transferred first to bank accounts of TECHNODYNE's affiliates
in India, and then to a bank account in the name of MKG
Consulting.

<u>Overt Act</u>

64.   In furtherance of said conspiracy and to
effect the illegal object thereof, the following overt act,
among others, was committed in the Southern District of New
York and elsewhere:

a.   On or about August 8, 2008, GERARD
DENAULT, the defendant, received a kickback payment agreed to
by TECHNODYNE, PADMA ALLEN and REDDY ALLEN, the defendants, in
the amount of approximately $76,000, and which was sent to a

bank account DENAULT controlled in Connecticut from a bank account in India controlled by PADMA ALLEN, via a wire transfer through New York, New York.

(Title 18, United States Code, Section 1956(h).)

## COUNT TWELVE

(Money Laundering Conspiracy)

The Grand Jury further charges:

65.  The allegations contained in paragraphs 1-23 of this Indictment are repeated and realleged as if fully set forth herein.

66.  MARK MAZER worked with SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, to conceal the $25 million in kickbacks he received on CityTime from DIMITRY ARONSHTEIN, the defendant, and Victor Natanzon, and they did so in the following manner:

a.  MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, established the First- and Second-Tier Shells (collectively, the "Shell Companies").

b.  MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, disguised MARK MAZER's links to the Shell Companies, and to the funds flowing into the Shell Companies, by among other things, listing themselves, but not MARK MAZER, as signatories on many of the bank accounts established in the names of the Shell Companies,

even though they engaged in numerous financial transactions, including transactions of $10,000 or greater, at the request of MARK MAZER.  SVETLANA MAZER also filed VENDEX questionnaires with the City that contained material misstatements and omissions in order to further disguise her links, and those of MARK MAZER, to the Shell Companies.

c.   MARK MAZER, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, established bank accounts in the names of these shell companies at numerous banks.  These defendants made false and misleading statements, and omitted material facts, in their statements to and filings with the banks holding accounts in the names of the Shell Companies.  For example, the defendants falsely stated, in application materials related to the bank accounts opened in the names of Shell Companies, that the accounts were needed by a business engaged in, among other things, information technology consulting activities, when in fact, the accounts were used to receive and distribute proceeds of criminal conduct.  MAKOVETSKAYA also provided false information concerning MAS to an employee of a bank ("Bank-1") conducting a "know your customer" interview concerning accounts opened in the name of MAS that was intended to, among other things, prevent Bank-1's accounts for being used for money laundering activities.

d.    MARK MAZER, SVETLANA MAZER, LARISA
MEDZON, and ANNA MAKOVETSKAYA, the defendants, engaged in, and
aided and abetted others engaged in, numerous financial
transactions, including numerous transactions involving
$10,000 and more of crime proceeds, that concealed and
disguised the nature, the location, the source, the ownership
and the control of the proceeds of the criminal scheme, and
transferred money among accounts established to facilitate the
scheme.  Transactions included hundreds of ATM transactions;
transfers of funds by check and wire transfer; deposits of
bulk cash into safe deposit boxes; and transfers of funds to
establish purported retirement accounts in the names of the
Shell Companies, and to purchase, among other things, homes
and other assets.  MARK MAZER, SVETLANA MAZER, LARISA MEDZON,
and ANNA MAKOVETSKAYA, the defendants, also personally enjoyed
proceeds of the criminal scheme, receiving hundreds of
thousands of dollars or greater from the proceeds of the
criminal conduct described above into bank accounts held in
their names.

### Statutory Allegations

67.  From at least in or about 2005 up to and
including in or about 2010, in the Southern District of New
York and elsewhere, MARK MAZER, DIMITRY ARONSHTEIN, SVETLANA
MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants,

-38-

and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

68.  It was a part and an object of the conspiracy that MARK MAZER, DIMITRY ARONSHTEIN, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud, conspiracy, bribery and Travel Act violations alleged in Counts One, Two, Five, Six, Seven and Eight of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

69.  It was further a part and an object of the conspiracy that MARK MAZER, DIMITRY ARONSHTEIN, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants,

and others known and unknown, within the United States and
involving United States persons, in an offense involving and
affecting interstate and foreign commerce, willfully and
knowingly would and did engage and attempt to engage in
monetary transactions in criminally-derived property of a
value greater than $10,000 that was derived from specified
unlawful activity, to wit, the offenses described in Counts
One through Eight of this Indictment, in violation of Title
18, United States Code, Section 1957(a).

<u>Overt Acts</u>

70.   In furtherance of said conspiracy and to
effect the illegal objects thereof, the following overt acts,
among others, were committed in the Southern District of New
York and elsewhere:

a.   On or about March 26, 2009, MARK MAZER,
the defendant, received a $30,000 transfer from a bank account
in Latvia via a bank account in New York, New York to a bank
account in the name of a shell company that he owned.

b.   On or about May 2, 2006, DIMITRY
ARONSHTEIN, the defendant, transferred $30,750.90 by
international wire to a bank account in Latvia via a bank
account located in New York, New York.

-40-

c.   In or about June 2010, SVETLANA MAZER, the defendant, submitted fraudulent VENDEX questionnaire responses to the City of New York in New York, New York.

d.   On or about January 22, 2010, LARISA MEDZON, the defendant, withdrew over $6000 in cash via multiple ATM transactions at multiple banks in New York.

e.   In or about April 2006, ANNA MAKOVETSKAYA, the defendant, while in New York, New York, provided false information to an employee of Bank-1 in response to questions during a "Know Your Customer" interview.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATION: COUNTS ONE THROUGH EIGHT

71.   As a result of committing one or more of the offenses alleged in Counts One through Eight of the Indictment, GERARD DENAULT, MARK MAZER, TECHNODYNE, PADMA ALLEN, REDDY ALLEN, and DIMITRY ARONSHTEIN, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the said offenses.

Substitute Asset Provision

72.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.)

## FORFEITURE ALLEGATION: COUNTS ELEVEN AND TWELVE

73.  As the result of committing the money laundering offenses alleged in Counts Eleven and Twelve of this Indictment, GERARD DENAULT, MARK MAZER, TECHNODYNE, PADMA ALLEN, REDDY ALLEN, DIMITRY ARONSHTEIN, SVETLANA MAZER, LARISA MEDZON, and ANNA MAKOVETSKAYA, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code,

-42-

Section 982, all property, real and personal, involved in the money laundering offense and all property traceable to such property.

**Substitute Asset Provision**

74.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants, up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1956.)


FOREPERSON

PREET BHARARA
United States Attorney

-43-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

MARK MAZER,
GERARD DENAULT,
PADMA ALLEN,
REDDY ALLEN,
TECHNODYNE LLC,
DIMITRY ARONSHTEIN,
SVETLANA MAZER,
LARISA MEDZON, and
ANNA MAKOVETSKAYA,

**Defendants.**

### INDICTMENT

S2 11 Cr. 121 (GBD)

(18 U.S.C. §§ 371, 666, 1343, 1346, 1349,
1952, 1956 & 2.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

6/15/11
MB   (S2) Indictment Filed with
2 arrest warrant under seal...Ellis,
USMJ.