D7HPMAZH                      Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                v.                        11 CR 00121 (GBD)
4
     MARK MAZER, ET AL.,
5
                    Defendants.
6    ------------------------------x
                                          New York, N.Y.
7                                         July 22, 2013
                                          2:45 p.m.
8
     Before:
9
                      HON. GEORGE B. DANIELS,
10
                                          District Judge
11
                          APPEARANCES
12   PREET BHARARA,
          United States Attorney for the
13        Southern District of New York
     BY:  HOWARD S. MASTER
14        ANDREW GOLDSTEIN
          Assistant United States Attorneys
15
     WINSTON & STRAWN, LLP
16        Attorneys for Defendant Mark Mazer
     BY:  GERALD L. SHARGEL, ESQ.
17
     ALSO PRESENT:  Mary Riverso, AUSA Paralegal
18                  Joan Margiotta, New York City Department of
     Investigation
19

20

21

22

23

24

25

1           THE COURT:  Good afternoon.  Let's continue with the

2   hearing.

3           The government had another witness.

4           MR. MASTER:  Yes, your Honor.  At this time the

5   government calls Robert Gigante.

6     ROBERT GIGANTE,

7       called as a witness by the Government,

8       having been duly sworn, testified as follows:

9           THE COURT:  You can acquire.

10          MR. MASTER:  Thank you, your Honor.

11  DIRECT EXAMINATION

12  BY MR. MASTER:

13  Q.  Where are you currently employed, sir?

14  A.  I work for the New York City Department of Investigation.

15  Q.  And what is your title there?

16  A.  I'm an inspector general.

17  Q.  For which agencies do you service as the inspector general?

18  A.  I'm the inspector general for -- one of the inspector

19  generals for squad one, covers the New York city department of

20  correction, sanitation, fire department, and various other

21  agencies.

22  Q.  For how long have you worked for the department of

23  investigation?

24  A.  Since 2006.

25  Q.  Is that also known as DOI, by the way?

Gigante – direct

1    A.   Yes, it is.

2    Q.   What did you do before you worked as DOI?

3    A.   Prior to working at DOI I worked for the New York city fire

4    department.  I was a lawyer in their investigations and trials

5    unit.

6    Q.   And you mentioned that you were a lawyer for the fire

7    department.  What legal training do you have?

8    A.   I have a J.D. and M.B.A. from Villanova University.

9    Q.   What, if any, training have you received specific to the

10   issue of Miranda rights?

11   A.   I have law school training from criminal law classes and

12   the various classes in law school.  Additionally I'm a peace

13   officer for the New York City department of investigation,

14   which requires training.  And there's training on Miranda

15   rights there as well.

16   Q.   Now I'd like to direct your attention to the early morning

17   of December 15, 2010.

18   A.   Okay.

19   Q.   Where were you employed at that time?

20   A.   At that time I was also -- I was at the department of

21   investigation.

22   Q.   Who was your supervisor at that time?

23   A.   The deputy commissioner for investigation Richard Sullivan.

24   Q.   What, if anything, did deputy commissioner Sullivan ask you

25   to do that morning?

Gigante – direct

1    A.   He asked me to accompany him and provide two teams for the

2    approach and arrest of Mark Mazer.

3    Q.   When you say provide two teams, two teams of what?

4    A.   Peace officers from my unit.

5    Q.   And how else did you assist in addition to providing those

6    two teams?

7    A.   In addition to providing those two teams I went with

8    Mr. Sullivan to Mr. Mazer's house.

9            Additionally, after the fact, I wrote up a memorandum

10   on the day's events.

11   Q.   Where did you go to effect the arrest?

12   A.   We went to Mr. Mazer's house in Manhasset, New York.

13   Q.   Were you the lead investigator on this case?

14   A.   No, I was not.

15   Q.   What, if any, prior involvement did you have in the

16   investigation?

17   A.   I was not the primary investigator.  It wasn't handled in

18   my group, my shop.  But the day or so before we had a general

19   meeting that went over what was going to be happening and the

20   day's events, so had some basic familiarity with the case.

21   Q.   And what, if any, awareness did you have of other arrests

22   being effected that day?

23   A.   I knew that -- the plan was there was going to be multiple

24   arrests and approaches throughout the day but I knew that our

25   approach was the first one.

1    Q.  Now, who was present to handle securing the premises and

2    other details related to the arrests?

3    A.  I had peace officers -- a couple groups of peace officers

4    with us.

5    Q.  Now, who was with you to focus on the arrest of Mark Mazer?

6    A.  Me, Rich Sullivan, the deputy commissioner of

7    investigation, Ron Gardella, and Bob Ryan, another federal

8    agent.

9    Q.  At approximately what time did you approach the door?

10   A.  About 6:50.

11   Q.  And how did you let them know that you were there?

12   A.  We rang the bell and knocked on the door.

13   Q.  How, if at all, did you identify yourselves as law

14   enforcement?

15   A.  We had shields present and we announced that we were from

16   the department of investigation, as well as federal agents.

17   Q.  Did there come a time when someone went to the door and

18   actually opened it from the inside?

19   A.  Yes.  Mr. Mazer opened the door.

20   Q.  And what, if anything, did investigator Gardella say to

21   Mark Mazer when he answered the door?

22   A.  We told him -- Mr. Gardella said that we had an arrest

23   warrant, a federal arrest warrant.  It was a very serious

24   situation and we wanted to speak with him.  At that point

25   Mr. Mazer invited us in and we entered into the house.

Gigante – direct

1   Q.   Who, if anyone, entered behind you and the others who you

2   mentioned?

3   A.   The additional teams of peace officers came in with us

4   behind us, as well as Rich Sullivan, Ron Gardella, and Bob

5   Ryan.

6   Q.   And at approximately what time had you all gained access

7   into the home.

8   A.   About 8:23.

9   Q.   I'm sorry?

10  A.   8:23 -- I'm sorry, 6:23.  Apologize.

11  Q.   Now who actually was responsible for going into each room

12  and securing the premises?

13  A.   The other peace officer teams.

14  Q.   And while those peace officer teams were securing the

15  premises, did there come a time when Mark Mazer said that he

16  needed to go upstairs?

17  A.   Yes.  He asked if he could throw some water on his face.  I

18  accompanied him upstairs.  He went into the bathroom.  And we

19  came down after.

20  Q.   And then how soon after everyone had gained access to the

21  premises did he ask to go upstairs?

22  A.   Almost immediately.

23  Q.   And you say that you accompanied him upstairs?

24  A.   I did.

25  Q.   Now what, if any, questions did you ask him while he was

1   upstairs?

2   A.  I didn't ask him any questions while we were upstairs.

3   Q.  And after he was done upstairs, where did you go?

4   A.  We came back downstairs and went into the dining room where

5   Mr. Mazer sat at the dining room table.

6   Q.  And what, if any, restraints were on him as he sat down at

7   the dining room table?

8   A.  He had no restraints on him.

9   Q.  And who else other than yourself was around the dining room

10  table?

11  A.  Rich Sullivan, Ron Gardella and Bob Ryan.

12  Q.  And did there come a time when Mark Mazer asked if he could

13  have some coffee?

14  A.  He did.  He asked if he could have some coffee.  I walked

15  with him to the kitchen.  He went to a very large, elaborate

16  coffee machine, pressed a button, got some coffee, and then we

17  walked back into the dining room table and he sat back down.

18  Q.  Who among you spoke first?

19  A.  Ron Gardella started by saying basically that this was very

20  serious matter.  We had a federal arrest warrant for his

21  arrest.  And just explained to him that this was his

22  opportunity to help himself.  And at that time Ron administered

23  Miranda rights.

24  Q.  And what, if anything, did you observe investigator

25  Gardella doing when he was administering the Miranda rights?

1   A.  He was reading the Miranda warnings, and I saw him looking

2   down at his hand where he had something in his hand.

3   Q.  How did you recognize investigator Gardella's statements to

4   be the Miranda warnings?

5   A.  I've given them multiple times before.  I also have legal

6   training from law school as well as the peace officer training

7   program where we learned to make and effect arrests which, of

8   course, includes giving Miranda warnings.

9   Q.  And at approximately what time were the Miranda warnings

10  administered?

11  A.  6:30.

12  Q.  Now, after Mazer was read his Miranda warnings did he agree

13  to speak with you?

14  A.  Yes, he did.

15  Q.  And what was your responsibility while he was speaking and

16  being questioned?

17  A.  I stood off to the side a little bit.  I took some notes

18  and sometime the next day I, and the day after, I wrote a memo

19  from my memory and looked at the notes while I was making the

20  memo.

21  Q.  And who was doing the questioning?

22  A.  For the most part it was Rich Sullivan and Ron Gardella.

23  Q.  And where were you taking the notes?

24  A.  I was standing a little bit off to the side of him, about

25  two or three feet, I think.

Gigante - direct

1   Q.   Did you write down everything I single thing -- every

2   question that was asked?

3   A.   No.

4   Q.   Did you write down every single thing that Mark Mazer said?

5   A.   No.

6   Q.   Why not?

7   A.   I just wanted a couple things that -- if I needed to jog my

8   memory that I could look at the next day when I did the memo.

9   Q.   And you mentioned just a moment ago that at some point he

10  asked for coffee.  Did there come a time when he asked for

11  other drinks?

12  A.   Yeah.  He asked for a water at one point too.  And I

13  escorted him to the kitchen and he got water and came back.

14  Q.   Now did there come a time when she stopped answering

15  questions?

16  A.   Yes.  Towards the end he just sort of got very silent and

17  wasn't answering any questions.  At that point he sort of -- he

18  made a statement where he said:  Well, if you're here to take

19  me away, then take me away.  And he stuck his hands out in a

20  motion where to give us his wrists to handcuff him.

21  Q.   And was he questioned at all after he made that statement

22  and made that gesture?

23  A.   No.  We didn't ask him any more questions after that.

24  Q.   And when, if ever, did he ask for an attorney during

25  questioning?

1   A.  He never asked for an attorney during questioning.

2   Q.  Or how about at any point during your direction?

3   A.  During my direction, he never asked for an attorney.

4   Q.  Now what, if anything, had to be done before Mazer -- Mark

5   Mazer could be transported for processing?

6   A.  We were also -- his wife was also arrested that day in the

7   house and there were also two kids and one of them was fairly

8   young so we wanted to make sure the kids were taken care of and

9   that we weren't leaving them alone and the house was secured

10  before we left.

11  Q.  So at approximately what time did you end up actually

12  leaving?

13  A.  7:50 or so.

14         MR. MASTER:  Now, your Honor, I just request

15  permission, since Mr. Shargel has raised the issue of inspector

16  general Gigante's notes in his brief, I just request permission

17  for inspector general Gigante to briefly explain where he

18  documented the various things that he was describing in the

19  notes.

20         THE COURT:  Go question by question and let me see

21  what your questions are.

22  Q.  Inspector general Gigante, have you reviewed your notes in

23  preparation for your testimony today?

24  A.  I have.

25  Q.  Have you also reviewed the memo that you generated based on

1    your recollections with the notes as a refresher?

2    A.  I have.

3    Q.  And I'd just like you to take a brief look before you.

4    They are facedown.  If you could just take a brief look at

5    what's been marked for identification as 3501A and 3501B.

6    A.  3501A.

7    Q.  Do you recognize 3501A?

8    A.  I do.

9    Q.  What is 3501A?

10   A.  It's the memo that I created dated December 17.

11   Q.  How about 3501B?  Do you recognize that?

12   A.  I do.  They are two pages of my handwritten notes from that

13   day.

14        MR. MASTER:  So, your Honor, I can offer these into

15   evidence if it's relevant or I can just, with the permission of

16   the Court, question Mr. Gigante based on.

17        THE COURT:  You can proceed either way you want unless

18   Mr. Shargel has an objection.

19        MR. SHARGEL:  No.  I have no objection to introducing

20   the notes.

21        MR. MASTER:  Government offers --

22        MR. SHARGEL:  Or questioning on the basis of the

23   notes, whichever.

24        THE COURT:  Then I'll admit the notes in evidence,

25   3501A and B for the hearing.

1           MR. MASTER:  Thank you, your Honor.

2           (Government's Exhibits 3501A and 3501B received in

3    evidence)

4    Q.  So turning first to 3501B.  When did you actually take

5    these notes?

6    A.  I took them when we approached the house and while we were

7    inside the house.

8    Q.  Where did you write down -- where on these notes did you

9    write down the time of knocking on the door and the time that

10   everyone had successfully entered the house?

11   A.  At the top.  I also dated it at the top of the first page.

12   Q.  The top of the first page?

13   A.  Yes.

14   Q.  And then where did you write down the time that Miranda was

15   given to Mark Mazer?

16   A.  On the second page in the middle towards the bottom.

17   Q.  And initially what did you write down?

18   A.  6:30.

19   Q.  And where did you write down where -- I guess the

20   statements to jog your memory as to what Mark Mazer had said?

21   A.  I started on the first page underneath the enter time, exit

22   time, and Mr. Mazer's name.

23   Q.  And for how long do those -- I guess those notes on his

24   statement continue?

25   A.  They continue -- the first page and then into the second

Gigante - direct

1    page about halfway.

2    Q.   What's the last note that you made about his statement?

3    A.   The last note I made about his statement was:  Did not know

4    Anna Makovetskaya nor MAS.  That's the last note about, from

5    his statement.

6    Q.   And then there's some writing at the bottom of that page.

7    When did you write those statements other than the -- I guess

8    the times?

9    A.   When he was done speaking and we were getting ready for

10   transport and making sure the residence was secure and the kids

11   were taken care of, I just jotted down a couple more things,

12   the fact that he wanted coffee, the fact that he wanted water.

13   He asked to speak to his wife.  We let him speak to his wife at

14   the kitchen table.  So I wrote down that.  I went back and I

15   wrote Miranda and Ron Gardella, and arrow to the 6:30 because

16   that's what it was and that's who gave it to him.  And then at

17   the end I put down he was silent towards the end.

18   Q.   You said you departed the premises around 7:50.  Where did

19   you write that down?

20   A.   Back at the top, right underneath the entry time.

21   Q.   And, again, what was the purpose of these notes?

22   A.   The purposes of these notes were to keep track of certain

23   times and have some notes to assist my memory when I was making

24   the memo the next day.

25   Q.   And when did you actually draft the memo?

1  A.  I drafted the memo at the end of the next day and it was

2  finalized the next day, the 17th.

3  Q.  That the memo that's marked and introduced into evidence as

4  3501A?

5  A.  It is.

6  Q.  How fresh were the events of December 15 in your mind when

7  you drafted that memo?

8  A.  Very fresh.

9  Q.  And what efforts did you take to make sure that your

10  recollection was accurate as you were typing this memo?

11  A.  I wrote up the memo from my memory and then I also checked

12  the notes to see what other notes I took down that day.

13  Q.  And where, if at all, did you document the giving of the

14  Miranda rights to Mark Mazer on this memo that's marked as

15  3501A?

16  A.  In the beginning, the second paragraph.

17  Q.  That's where you stated:  Mazer was advised of his rights

18  and read Miranda warnings by agent Gardella at 0630 hours and

19  agreed to speak with us?

20  A.  Yes.

21  Q.  How well, as you sit here today, do you remember Ron

22  Gardella doing exactly that, reading the Miranda rights to Mark

23  Mazer?

24  A.  I remember it well.

25          MR. MASTER:  No further questions.

Gigante – direct

1          MR. SHARGEL:  Is this marked as an exhibit?  When I

2    say "this," the notes that you just referred to?

3          MR. MASTER:  I marked -- just for the record, your

4    Honor, I marked the copies that we had provided in discovery as

5    3501A and 3501B.  Mr. Shargel had requested that we bring the

6    original signed memo and the original pen and paper notes with

7    us.  We accommodated that request.  I'm happy for them to be

8    marked as a Government Exhibit or a Defense Exhibit.  I haven't

9    introduced them yet.

10         MR. SHARGEL:  I'll introduce them as Defense Exhibit 1

11   and Defense Exhibit -- I'll say A.  Defense Exhibit A, which

12   are the formal notes of December 17, 2010, also been referred

13   to as 3501A.

14         THE COURT:  Is that the exact same document, just the

15   original?

16         MR. SHARGEL:  This is the -- this is the prepared

17   report that he prepared as he has testified after the event on

18   the 16th and 17th.

19         THE COURT:  So Defense A is the original and 3501A is

20   a copy of that document?

21         MR. SHARGEL:  Yes.  So without objection?

22         MR. MASTER:  Absolutely.

23         MR. SHARGEL:  And I'm also offering as Defense Exhibit

24   B the handwritten notes that have been referred to.  These are

25   the original notes.

Gigante – direct

1          THE COURT:  So you want both the copy and the

2     original?

3          MR. SHARGEL:  It's actually not the copy.  This is not

4     a copy.  Let me explain.

5          THE COURT:  3501A is a copy of defense A?  No?  That's

6     where you confuse me.

7          MR. SHARGEL:  I think that is right.  Now I'm

8     referring to 3501B.

9          THE COURT:  3501B is a copy of Defendant's B?

10          MR. SHARGEL:  I'm offering the original.  But yes.

11     The answer is yes.  We know what we're going to be talking

12     about.

13          THE COURT:  So you want the original -- you want

14     Defense A and Defense B in evidence?

15          MR. SHARGEL:  Yes.

16          THE COURT:  And those documents are the original

17     documents?

18          MR. SHARGEL:  Yes.

19          THE COURT:  Of 3501A and 3501B?

20          MR. SHARGEL:  Correct.

21          THE COURT:  They will be admitted into evidence for

22     the hearing.

23          (Defendant's Exhibits A and B received in evidence)

24          (Continued on next page)

25

1   CROSS-EXAMINATION

2   BY MR. SHARGEL:

3   Q.   When did you turn these notes -- is it deputy inspector

4   Gigante?

5   A.   It's inspector general Gigante.

6   Q.   Can I just call you Mr. Gigante?

7   A.   Yeah.

8   Q.   Mr. Gigante, when did you turn what's been marked as

9   Defense Exhibit B, the notes that you took contemporaneously on

10  December 15, 2010 --

11  A.   Yes.

12  Q.   That was the date, right?

13  A.   Yes.

14  Q.   When did you hand these over to the U.S. Attorney's Office?

15  A.   I don't know.  I don't know when they were handed over to

16  the U.S. Attorney's Office.

17  Q.   I'm sorry?

18  A.   I don't know when they were handed over to the U.S.

19  Attorney's Office.  I finished my memo and attached the notes

20  to them and handed them to the person who had the file.

21  Q.   Well when did you turn them over to -- did you turn them

22  over to a superior person at the department of investigation?

23  A.   No.

24  Q.   Were they in your possession?

25  A.   They were on the 10th when I wrote them, the 16th and

D7m9mazh                    Gigante - cross

1    the 17th.

2    Q.   When after that?

3    A.   After that I was done with them.

4    Q.   Well, you were done with them.  Did there come a time when

5    you learned that a motion to suppress had been made by Mark

6    Mazer?  Did there come a time that that happened?

7    A.   Yes.

8    Q.   Did there come a time when you learned that events of

9    December 15 and the early morning hours of December 15, 2010

10   would be an issue in this case?

11   A.   Yes.

12   Q.   And do you recall as you sit here now when the first time

13   you handed these notes over to any other officer, agent,

14   inspector, deputy inspector, anywhere?

15   A.   I don't remember what date it was.

16   Q.   Do you remember what year it was?

17   A.   2010.

18   Q.   When in 2010?  This is December 15.  There are only two

19   weeks left in 2010.  Do you have a memory, as you sit here now,

20   can you say by your oath that in 2010, in the remaining days of

21   that year, that you turned them over to someone?

22   A.   I recall turning them over.  If it wasn't the end of 2010

23   it was the beginning of 2011.

24   Q.   Isn't it a fact, sir, that you turned these over to the

25   U.S. Attorney's Office after you learned that suppression and

D7m9mazh                    Gigante - cross

1   Miranda warnings would be an issue in this case?

2   A.  No.

3   Q.  Didn't you, sir, in these few scratch notes if I may -- by

4   the way there was a request that you bring me the original

5   notebook if you had it, right?

6   A.  I was asked for the original notes.  I said I didn't have

7   them.

8   Q.  The original notebook?

9   A.  No.  I was asked for the original notes.

10  Q.  Just the notes.  Well, you have them.  They're here, aren't

11  they?

12  A.  I haven't had them -- I haven't seen them -- I haven't seen

13  them since this morning.  I haven't touched them since I turned

14  them over.

15  Q.  These notes, these few notes that you took in your own

16  handwriting were the chronology of events that happened,

17  correct?

18  A.  Not necessarily the chronology.

19  Q.  Well didn't you make entries in these notes as things

20  developed?

21  A.  I did.

22  Q.  And did there come a time when there was some questioning

23  of Mr. Mazer?

24  A.  There was.

25  Q.  And did you make certain entries -- may I approach the

D7m9mazh                    Gigante - cross

1   witness your Honor?

2           THE COURT:  Yes.

3   Q.  Did you make certain entries beginning on page one of these

4   notes, did you make certain entries about events as they

5   occurred?

6   A.  Yes.

7   Q.  You made entries after putting Mark Mazer, where he made a

8   statement, right?  Yes?

9   A.  Yes.

10  Q.  And after that first line, after Mark Mazer, the second

11  line is something else claimed to have been said, right?

12  A.  Yes.

13  Q.  And on, and on, and on, right?

14  A.  Yes.

15  Q.  The important date -- times were in the upper left -- I

16  don't want to rip the document, it's stapled -- but they were

17  in the upper left corner, right?

18  A.  Which times?

19  Q.  These times, 7:50.  That's when you left the residence?

20  A.  That's when I left the residence.

21  Q.  What's the other time?  Can you read that?

22  A.  I can't read it.  There's a staple over it.  It's 6:23 and

23  6:15.

24  Q.  Don't destroy the integrity of the exhibit.

25  A.  I didn't.

D7m9mazh                    Gigante - cross

1    Q.  I will show you in one moment.

2    A.  Sure.

3           THE COURT:  Might be easier to show him the 3500.

4    BY MR. SHARGEL:

5    Q.  Now I'm using 3501B for identification.  I show you what's

6    been -- 3501B for identification.

7           THE WITNESS:  Yes, sir.

8           THE COURT:  I believe it's in evidence.

9           MR. SHARGEL:  In evidence.

10   Q.  What's this time?  When I say "this" I mean on the first

11   page of that exhibit.

12   A.  Approximately 6:15.

13   Q.  And then what's the time after it?

14   A.  6:23.

15   Q.  So this is where you were keeping all of the important

16   times when you knocked on the door, right?

17   A.  That's where we knocked on the door.

18   Q.  6:15.  6:23 he comes down, correct?

19   A.  Yep.

20   Q.  And 7:50 is when you leave, right?

21   A.  Correct.

22   Q.  By the way, because it's your handwriting not mine.  What

23   is that word on page two.

24          When I say "that word" I mean from the second line

25   from the bottom on page two of the exhibit, what's that word?

D7m9mazh                        Gigante - cross

1    6:37?

2    A.  That's wife.

3    Q.  Wife 6:37?

4    A.  Yes.

5    Q.  What does wife 6:37 mean as you wrote it down?

6    A.  That's when she got read her rights.

7    Q.  I'm sorry?

8    A.  When she received Miranda rights.

9    Q.  She was read the Miranda rights?

10   A.  At 6:37.

11   Q.  At 6:37?

12   A.  Yes.

13   Q.  And this word is wife, right?

14   A.  Yes.

15   Q.  And this is read in conjunction with 6:30, right?

16   A.  No.

17   Q.  No?

18   A.  Can you repeat the question?

19   Q.  3501B for -- in evidence.  I'm asking you this means -- is

20   this in connection with 6:30, 6:37?

21   A.  No.  The 6:30 is in connection with Miranda and Ron

22   Gardella.  And then the 6:30 is in connection with the wife.

23   Q.  6:37?

24   A.  6:37.  Yes.

25   Q.  So let me ask you this question.  When you said you put two

D7m9mazh                          Gigante - cross

1   teams together, how many people on a team?  How many people

2   were there?

3   A.  Two people on each team.

4   Q.  And were there other officers or agents -- I'll say

5   officers or agents present on the scene that day?

6   A.  Yes.

7   Q.  How many, as best you can recall, tell the Court how many

8   agents, officers were on the scene that day?

9   A.  That were in the house or on the scene?

10  Q.  Well first people gathered at the perimeter, right?

11  A.  Yes.  We had people on the perimeter.

12  Q.  In other words, people arrived in cars, correct?

13  A.  Yes.

14  Q.  How many cars, as best you can recall?

15  A.  I don't remember how many cars.

16  Q.  Well how many agents, as best you can recall?

17  A.  I don't remember specifically how many.  I know how many

18  that I had there.

19  Q.  As we have it, there were others who were not under your

20  supervision, right?

21  A.  Correct.

22  Q.  And did there come a time when you left whichever head --

23  where did you leave from?  Let me ask a question.  Where did

24  you leave from?

25  A.  I don't remember the exact address.  We met somewhere close

1    to Manhasset.

2    Q.  And from that address somewhere close in Manhasset, a

3    number of cars, you don't remember the number, but a number of

4    cars headed toward the home, right?

5    A.  Yes.

6    Q.  And the cars contained a number of agents, including you

7    and deputy inspector Sullivan, right?

8    A.  Deputy commissioner.

9    Q.  Deputy commissioner Sullivan.

10          Mr. Sullivan is the supervisor of department of

11   investigation, right?

12   A.  He's one of them.

13   Q.  He's the deputy commissioner?

14   A.  Yes.

15   Q.  So several people go to the door, right?

16   A.  Yes.

17   Q.  It's 6:15 in the morning now, right?

18   A.  Yes.

19   Q.  And there are people outside on the perimeter, right?

20   A.  Yes.

21   Q.  And there are how many agents that actually go to the door?

22   A.  When you say agents, there were two agents.

23   Q.  When I say agents, I'm not breaking down officers, agents.

24   I mean law enforcement people, people whose assignment that day

25   was to arrest Mark Mazer, arrest his wife, and enforce the

1   laws, right.  So when I use the officers or agents description,

2   you understand?  We're on the same page?

3   A.  Yes.  I want to be clear.

4   Q.  So whether it's an officer, whether it's an agent, whether

5   it's a deputy commissioner of the department of investigation

6   or even a New York City police officer, a number of people are

7   on the perimeter, right?

8   A.  Yes.

9   Q.  And that is to make sure that the house is secured, right?

10  A.  Yes.

11  Q.  That is to avert any danger in executing the arrest, right?

12  A.  Yes.

13  Q.  And you had done this many times before, right?

14  A.  I had.

15  Q.  You studied it when you were in law school, right?

16  A.  Not technically this, but I studied law.

17  Q.  But you knew a whole lot about arrests, right?

18  A.  Sure.

19  Q.  Miranda and its progeny, correct?

20  A.  Yes.

21  Q.  You approached the door.  Mr. Sullivan approaches the door.

22  Who else?

23  A.  Federal Agent Ron Gardella and Bob Ryan.

24  Q.  6:15.  You knock on the door.  And it takes some time for

25  Mr. Mazer to answer, right?

1   A.  Yes.  Not long.

2   Q.  Not long?

3   A.  Yes.

4   Q.  How long would you think?

5   A.  I'd say a minute or two.

6   Q.  And did you know that Mr. Mazer had children?

7   A.  Yes.

8   Q.  Did you know that the children were in the house?

9   A.  At the time we did not know but we found out as soon as we

10  got in there.

11  Q.  Did you know how many children he had?

12  A.  We knew there were at least two.

13  Q.  And did you come to learn that there were three children

14  sleeping in the house?

15  A.  I don't remember, to be honest with you.

16  Q.  No recollection of that?

17  A.  I remember at least two.  There may have been a third, but

18  I don't remember.

19  Q.  Mr. Mazer answers the intercom.  You later learn that he

20  had an intercom, right?

21  A.  Yes.

22  Q.  And he had a camera that showed him who was at the door,

23  right?

24  A.  I don't remember that.

25  Q.  You had a badge on?

D7m9mazh                          Gigante - cross

1    A.  Yes.

2    Q.  Around your neck, correct?

3    A.  I believe it was on my lapel at the time.

4    Q.  Who spoke when Mr. Mazer came to intercom?

5    A.  Ron Gardella.

6    Q.  And what did Mr. Gardella say?

7    A.  He said that we are federal agents, and we need to speak

8    with him.

9    Q.  And there came a time when Mr. Mazer came downstairs,

10   right?

11   A.  Yes.

12   Q.  And you said that was approximately 6:23?

13   A.  No.  6:23 we were in the house.

14   Q.  You were in the house by 6:23?

15   A.  Yes.

16   Q.  And when you went into the house, did you see what

17   Mr. Mazer was wearing?

18   A.  I don't remember what he was wearing.

19   Q.  You don't remember what he was wearing?

20   A.  No.

21   Q.  Do you remember -- weren't you the agent -- I'll say agent,

22   weren't you the person who was assigned walking around the

23   house with Mr. Mazer?

24   A.  Yes.

25   Q.  And weren't you the person who went upstairs with him when

1   he asked to go upstairs and wash his face and attend to

2   whatever he needed to attend to upstairs, right?

3   A.  Yeah.

4   Q.  Weren't you that person?

5   A.  I was.

6   Q.  And is it your testimony now that you don't recall what he

7   was wearing at that time?

8   A.  Yeah.  I don't remember what he was wearing.

9   Q.  Well does it refresh your recollection, do you remember

10  seeing pajamas on his bottom?

11  A.  I don't remember what he was wearing.

12  Q.  Do you remember that he was wearing a T-shirt on the top,

13  right?

14  A.  Again, I don't remember what he was wearing.

15  Q.  Well, you weren't expecting to take him to court with the

16  clothes he was sleeping in, were you?

17  A.  No.

18  Q.  You knew full well from your prior experience in other

19  arrests that you were going to give him an opportunity to get

20  dressed, right?

21  A.  I'm sorry.  Yep.

22  Q.  So the answer to that is yep?

23  A.  Yes.  I'm sorry.

24  Q.  So, do you remember a time when -- well just stay with the

25  chronology.  So you come into the house and that's 6:27, is it?

D7m9mazh                        Gigante - cross

1   A.   6:23.

2   Q.   6:23.  So you're in the house.  Is Mr. Mazer told that

3   there is a warrant for his arrest?

4   A.   He was.

5   Q.   Did -- was he told that there was a warrant for his wife's

6   arrest?

7   A.   He was.

8   Q.   And did he ask to go upstairs at that point?

9   A.   He did.

10  Q.   You went upstairs with him?

11  A.   Yes.

12  Q.   You say he was under no restraint when he was -- that

13  morning when he was sitting at the table -- jumping ahead a

14  little bit -- but when he was sitting at the table there was no

15  restraints, right?

16  A.   I said he was not in restraints.

17  Q.   So when he went upstairs to use the bathroom and get

18  dressed, no restraints, no handcuffs?

19  A.   No handcuffs.

20  Q.   That's what you meant when you said no restraints, right?

21  A.   Yes.

22  Q.   You get upstairs.  And did Mr. Mazer use the bathroom?

23  A.   He went into the bathroom, yes.

24  Q.   And you actually went into the bathroom with him, right?

25  A.   I went in first to see if there was any windows, and then I

1   stood at the door with the door open.

2   Q.  He asked to close the door.  You wouldn't allow him to

3   close the door, right?

4   A.  I told him it had to stay open.

5   Q.  Because that's common protocol?  That's how it works?

6   A.  Yes.

7   Q.  So he wasn't under any restraint, but you were carefully

8   guarding his movements, right?

9   A.  Yeah.

10  Q.  This was already after he had been told there was a

11  warrant -- people were there to arrest him, right?

12  A.  Yes.

13  Q.  There was never any confusion or mistake about that, right?

14  A.  No.

15  Q.  When does he ask for coffee?

16  A.  I don't remember.  It could have been when we came down.  I

17  don't remember when he asked for coffee.

18  Q.  Do you remember first him changing his clothes into street

19  wear, pants?

20  A.  I don't remember.

21  Q.  It was a December, early December morning.  Did you see him

22  get a jacket from the closet, anything like that, before he

23  went downtown?

24  A.  Before he went downtown.  I don't remember.  I'm sure he

25  probably did.

D7m9mazh                        Gigante - cross

1   Q.  You don't remember that at all?

2   A.  No.

3   Q.  Do you remember him washing his face and brushing his

4   teeth, those ordinary and mundane tasks?

5   A.  Yes.  I do remember.

6   Q.  You remember that?

7   A.  Yes.

8   Q.  Do you remember what time you get downstairs again?

9   A.  I don't remember -- I didn't look at my watch when we got

10  back downstairs, no.

11  Q.  Well the coffee wasn't on the second floor.  The coffee was

12  in the kitchen on the first floor, right?

13  A.  Yes.

14  Q.  And you said he had a big fancy coffee pot.  He offered

15  others coffee, right?

16  A.  I don't remember if he did but I --

17  Q.  Do you remember taking time to boil the water?

18  A.  No.  It wasn't like a boiling the water.  It was a fancy

19  machine.  You push the button and got coffee.

20  Q.  Did you see him take the actual coffee that was going to be

21  used?

22  A.  No.

23  Q.  Did you see him do that?

24  A.  No.

25  Q.  Did you see him put milk and sugar in the coffee?  Did you

1    see him do that?

2    A.  No.

3    Q.  So what time was it, if you can recall, your best

4    recollection as you sit here now, what time was it that you get

5    to that table?

6    A.  I don't remember what exactly time we sat at the table.

7    Q.  You told us that when you sat at the table, regardless of

8    the time, that an agent began to talk, right?

9    A.  Yes.

10   Q.  And the agent that first began to talk was which agent?

11   A.  It was Ron Gardella.

12   Q.  And deputy commissioner Richard Sullivan, he was at the

13   table also, wasn't he?

14   A.  Yes, he was.

15   Q.  You were at the table, weren't you?

16   A.  I was not sitting at the table.  I was standing in the

17   area.

18   Q.  Standing nearby, right?

19   A.  Yes.

20   Q.  Obviously within earshot, right?

21   A.  Yes.

22   Q.  And did you hear agent Gardella speaking to Mr. Mazer?

23   A.  I did.

24   Q.  And you knew full well that Mr. Mazer was going to be the

25   first one arrested that morning, correct?

D7m9mazh                    Gigante - cross

1   A.  Yes.

2   Q.  There were other people throughout the city that were going

3   to be arrested.  You heard that told to Mr. Mazer, right?

4   A.  Yes.

5   Q.  And those -- you knew why you were in Mr. Mazer's house

6   first, correct?

7   A.  Yes.

8   Q.  You understand the deal of cooperation and soliciting

9   someone's cooperation, right?

10  A.  I do.

11  Q.  And that was part of the plan that morning, right?

12  A.  Yes.

13  Q.  To see if Mr. Mazer could be persuaded to cooperate against

14  others, right?

15  A.  Yes.

16  Q.  And you knew full well as an employee of the department of

17  investigation that those others were specific people who were

18  city officials, right?

19  A.  Some of them were, yes.

20  Q.  In fact, names were named?  Names were put before

21  Mr. Mazer?  You remember that, right?

22  A.  Yes.

23  Q.  And this was all by Mr. Gardella, right?

24  A.  Mr. Gardella and Mr. Sullivan.

25  Q.  Actually you put in your note that there was no restraint

1   at this time, right?

2   A.   (No response).

3   Q.   No restraint?

4   A.   I don't recall.

5   Q.   You don't recall that?

6        Do you remember being interviewed again by the United

7   States Attorney's Office, anyone from the United States

8   Attorney's Office?

9   A.   Being interviewed?

10  Q.   Interviewed, preparing your testimony for this afternoon.

11  A.   Yes.  I met with the U.S. Attorney's Office.

12  Q.   How long ago?

13  A.   It was last week.

14  Q.   So let me show you what's been marked here for

15  identification.

16        MR. SHARGEL:  If I may, your Honor?

17        THE COURT:  Yes.

18  BY MR. SHARGEL:

19  Q.   3501C for identification.  I ask you to look at this and

20  tell us whether you recognize it.

21  A.   I don't recognize it.

22  Q.   Well looking at the content, does it refresh your

23  recollection that you had an interview with a prosecutor who

24  was taking notes as he spoke to you?

25  A.   I certainly met with a prosecutor, yes.

D7m9mazh                          Gigante - cross

1            I don't understand the question.

2     Q.  My question to you is having looked at that document, 3501C

3     for identification, does that in any way refresh your

4     recollection?  And I point, respectfully, to the first line.

5     A.  Mm-hmm.

6     Q.  Does that say anything about -- or looking at that, does

7     that refresh your recollection as to what those two pages

8     contain?

9     A.  When you're asking if it refreshes my recollection.  I

10    don't know what these are.  I haven't seen these before today.

11    Q.  Even if you hadn't -- you've heard the expression in law

12    school that you can show someone the kitchen sink to refresh

13    recollection?

14    A.  Yes.

15    Q.  You know that one, right?

16    A.  Sure.

17    Q.  Even though you've never seen this before, I ask you to

18    take a look at it -- it's not the kitchen sink, but it's two

19    pages of notes -- I ask you to take a look at that and ask if

20    it refreshes your recollection about a meeting with the

21    prosecutors in which you disclosed or disgorged those facts.

22    A.  I don't recognize them.  They certainly appear to be notes

23    about a meeting I had.  I met with the U.S. Attorney's Office

24    last week.

25            I still don't quite understand the question.

D7m9mazh                       Gigante - cross

1   Q.  You told the prosecutors -- you made specific mention of

2   the fact that there were no restraints, right?

3   A.  Yes.

4   Q.  And you noted that, and you understood full well why that

5   point was made, or why that question was asked, right?

6   A.  Yes.

7   Q.  Because a person who is not in custody doesn't have to be

8   Mirandised, right?  Is that your understanding?

9   A.  Yes.

10  Q.  So, getting back to the proposition that you got there that

11  day knowing full well that the objective was, if at all

12  possible, to achieve cooperation or have Mr. Mazer cooperate

13  against others, including city officials, right?

14  A.  Yes.

15  Q.  So after Ron Gardella started talking to Mr. Mazer -- by

16  the way, how long did that take?  Do you remember him making a

17  speech?

18  A.  I remember him saying to him this was very serious.  We had

19  a warrant for his arrest.  And that this was the opportunity to

20  help himself.

21  Q.  Just that?

22  A.  Yeah.  Just that.  And at that point is when he began

23  reading the Miranda rights.

24  Q.  And by the way, the part about the speech by Mr. Gardella

25  is not in your rough notes, right?

D7m9mazh                     Gigante - cross

1    A.  No.  Not that I remember.

2    Q.  Did anyone else make a speech to Mr. Mazer?

3    A.  The only people that spoke to Mr. Mazer were Rich Sullivan

4    and Ron Gardella.

5    Q.  Well Rich Sullivan spoke to him on the subject of

6    cooperation as well, right?

7    A.  Yes.

8    Q.  And Rich Sullivan spoke to him on the subject of

9    cooperation -- was that before or after Mr. Gardella?

10   A.  After.

11   Q.  And how long did Mr. Gardella speak to him?  Tell me again.

12   A.  At which -- how long when?

13   Q.  When you sat down at the table.

14   A.  It was very quick.  He said you're in a lot of trouble.

15   This is a very serious situation.  And he said this is the

16   opportunity to help yourself.  And at that point --

17   Q.  I'm sorry.  I didn't mean to --

18   A.  And at that point he read his Miranda rights.

19   Q.  So this is someone who would be an important cooperator, as

20   you saw it, right?

21   A.  Mm-hmm.

22   Q.  Yes?

23   A.  Yes.

24   Q.  And that was the sum total of what was said to him, Now is

25   the time to cooperate?

D7m9mazh                    Gigante - cross

1    A.  Well, no.  They continued to speak with him after they gave

2    Miranda rights.

3    Q.  When you say "they," isn't it a fact, sir, that deputy

4    commissioner Sullivan spoke to Mr. Mazer at length?

5    A.  That day, yes.

6    Q.  And what did Mr. Sullivan have to say to Mr. Mazer?

7    A.  Mr. Sullivan was asking him questions, asking about if he

8    knew certain companies, asked about certain people.

9    Q.  Did Mr. Sullivan have any paper?

10   A.  I don't remember.

11   Q.  Well do you remember, sir, as you sit here now,

12   Mr. Sullivan showing something to Mr. Mazer at that table?

13   A.  I don't remember that.

14   Q.  Well do you remember, sir, that there was created an

15   alleged organizational chart relating to the disbursement of

16   monies at -- in the City Time project?  Do you remember that?

17   A.  Not specifically.

18   Q.  Well do you remember -- you said you were briefed.  You

19   were not directly involved but you were briefed in connection

20   with this matter, right?

21   A.  Yes.

22   Q.  And did you know that the department of investigation

23   and/or the United States Attorney's Office had prepared a

24   chart, an organizational chart of what they alleged was a

25   conspiracy?  Do you remember that?

D7m9mazh                          Gigante - cross

1    A.  I have no specific recollection of that.

2    Q.  I'm sorry?

3    A.  I don't recall that.

4    Q.  Do you recall as you sit here now that at that table on

5    December 15, 2010 that Mr. Sullivan, hearing the question I'm

6    putting to you now, that Mr. Sullivan took out a chart and

7    showed it to Mr. Mazer?

8    A.  I don't remember that.

9    Q.  Do you remember Mr. Sullivan saying that he knew all about

10   what Mr. Mazer allegedly had done?  Do you remember that?

11   A.  Yes.

12   Q.  Do you remember agent Sullivan saying that his mother was

13   going to be arrested, would be arrested that day?  Do you

14   remember that?

15   A.  Yes.

16   Q.  Do you remember agent Sullivan -- Mr. Sullivan saying that

17   on that day, that his, Anna, would be arrested?  Do you

18   remember that?

19   A.  Yes.

20   Q.  Do you remember on that day saying -- hearing Mr. Sullivan

21   saying that there would be others arrested as well, right?

22   A.  I don't specifically remember that, but.

23   Q.  Do you remember Mr. Sullivan saying that his uncle would be

24   arrested?

25   A.  I don't specifically remember that.

71

1   Q.  Well do you specifically remember what it was that

2   Mr. Sullivan was telling Mr. Mazer in order to have him

3   cooperate?

4   A.  I remember him asking questions about various companies,

5   asking questions about accounts and other business.

6   Q.  Do you know what proactive cooperation is?

7   A.  Yes.

8   Q.  What do you understand proactive cooperation to be?

9   A.  When -- we use it as when somebody cooperates with an

10  investigation to help develop it.

11  Q.  And cooperates with an investigation in what respect when

12  it's proactive as opposed to passive?

13  A.  In terms of proactive is, for example, wearing a wire,

14  going undercover, making phonecalls, etc.

15  Q.  And wearing a wire is an exquisite -- obtaining information

16  from a wire is an exquisite form of proof, isn't it?

17  A.  Yes.

18  Q.  And you knew full well on that day, on December 15, 2010

19  that if news of Mr. Mazer's arrest, were he to agree to

20  cooperate, if it had been made public, that would have

21  diminished, if not extinguished, an opportunity to have him

22  wear a wire.  You knew that, right?

23  A.  Sure.

24  Q.  And you have been involved in situations, in arrests where

25  a putative defendant or an actual defendant is told that we

1   won't take you downtown, we won't take you to be arraigned if

2   you'll agree to cooperate, wear a wire, correct?

3   A.  That has happened in the past, yes.

4   Q.  I'm sorry?

5   A.  That has happened in the past, yes.

6   Q.  There were no city officials that were going to be arrested

7   that day on December 15, 2010, right?

8   A.  I don't recall.

9   Q.  Well, now that it's July of 2013 have any city officials

10  been arrested and charged with offenses relating to City Time?

11  A.  I'm not sure.

12  Q.  You're with the department of investigation how long?

13  A.  Six years.

14  Q.  And the department of investigation investigates fraud,

15  corruption, deceit, chicanery, whatever, with city officials,

16  right?

17  A.  With anybody who works for the city, yes.

18  Q.  And it's your testimony, sir, that as you sit here now you

19  don't know whether any city officials were ever prosecuted in

20  connection with City Time?

21  A.  Offhand, no.

22  Q.  Do you allow that the answer is none?

23  A.  I have no recollection.  I don't know.

24  Q.  Deputy commissioner Sullivan -- by the way was he deputy

25  commissioner at the time as well?

1    A.  Yeah, I believe so.

2    Q.  Deputy commissioner Sullivan discussed all of these

3    possibilities about Mark Mazer's cooperation on that morning,

4    right?

5    A.  Yes.

6    Q.  There came a time when you said Mr. Mazer stopped answering

7    questions, right?

8    A.  Yes.

9    Q.  He was silent, correct?

10   A.  Silent.  Yes.

11   Q.  And he said:  If you're going to take me, take me, right?

12   A.  He said:  If you're here to take me away, take me a way is

13   what I recall.

14   Q.  And you told us that his hands, he put his hands in front

15   of him like "handcuff me" as if to say, right?

16   A.  Yes.

17   Q.  What time was that?

18   A.  I don't recall what time it was.

19   Q.  Well give us an approximate time, if you will.

20   A.  It was -- it had to have been some time after 7:00, 7:30,

21   after that.

22   Q.  7:00, 7:30, or after that?

23   A.  You're asking me to give an approximate time.  I don't

24   remember.  I know we left the house at 7:50.  It took a little

25   bit before we left the house.

D7m9mazh                    Gigante - cross

1   Q.  Forgive me.  I do want to take a moment, and I'm not going

2   to be much longer, but I do want to take a moment in connection

3   with these times.

4           So he's down at the dining room table by somewhat,

5   what, 6:27, 6:28, before 6:30, right?

6   A.  Yeah.  Right before 6:30.

7   Q.  Because you told us he was warned of his Miranda rights at

8   6:30, right?

9   A.  Yes.

10  Q.  So he's down there.  And it's now 6:30, approximately,

11  right.  You remember that?

12  A.  Yes.

13  Q.  And you have your notes to refresh your recollection.  You

14  have that Exhibit 3501A in evidence.  The questions that are

15  being asked are set forth, right?  They're set out, correct?

16  A.  In -- my notes.

17  Q.  In your notes, and then again more explicitly in your memo,

18  the memo that's 3501A, right?

19  A.  Yes.  My notes are really -- are statements that he was

20  making.  Not necessarily the questions.

21  Q.  Not the question?

22  A.  Yes.

23  Q.  You made no record of the questions that were being asked,

24  just the statements that were given?

25  A.  In the memo I may have put some of the questions that were

D7m9mazh                        Gigante - cross

1   asked, yes.

2   Q.  So how many questions -- how many answers do you have in

3   3501A?

4   A.  Offhand.

5   Q.  It's right in front of you.

6   A.  Would you like me to read it?

7   Q.  Sure.  It's in evidence.

8          First, looking at A.  We're first looking at the

9   report that you made on the two days following December 15.

10  A.  The A -- you're talking about the actual memo?

11  Q.  I'm sorry.

12  A.  The memo you're asking me about?

13  Q.  Yes.  The memo.

14         You have bullets here, right?

15  A.  There are about ten bullets.

16  Q.  There are ten bullets and each bullet contains usually one

17  sentence, right?

18  A.  Yes.

19  Q.  One or two with two sentences but generally one sentence,

20  right?

21  A.  Yes.

22  Q.  How long did it take is what I'd like know.  How long did

23  this take?

24  A.  When you say how long did what take?

25  Q.  How long did it take for these questions or answers.  You

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    don't have the questions here, but answers.  How long did it

2    take for that to occur?

3    A.  We spoke to him probably for about 40 minutes or so, 45

4    minutes.

5    Q.  So you were at that table for 40 or 45 minutes?  Is that

6    your testimony?

7    A.  Yes.

8    Q.  What were you doing until 7:50, sir?

9    A.  (No response).

10   Q.  7:50?

11   A.  7:50?

12   Q.  Yes.

13   A.  Was when everybody was outside of the residence.

14   Q.  That's when everyone left, right?

15   A.  That's when everyone was outside the residence, yes.  At

16   some point -- I'm sorry.  What was your question?

17   Q.  What time was it, based often the 7:50, if you could give

18   us your best guess -- I withdraw guess.  I don't mean guess.

19   Give us your best estimate of how long Mr. Mazer had been at

20   that table before he says take me away.

21   A.  Between 40, 45 minutes, I believe.

22   Q.  Between 40 and 45 minutes?

23   A.  I believe so.  We were speaking for that length of time,

24   yes.

25   Q.  And for that length of time -- withdrawn.

1          MR. SHARGEL:  I have no further questions.

2          THE COURT:  Any further questions of this witness,

3     Mr. Master?

4          MR. MASTER:  No redirect, your Honor.

5          THE COURT:  Thank you, sir.  You may step down.

6          (Witness excused)

7          THE WITNESS:  Thank you, your Honor.

8          THE COURT:  Mr. Master, does the government wish to

9     call any further witnesses?

10         MR. MASTER:  No, your Honor, subject to potential

11    rebuttal witnesses.

12         THE COURT:  Mr. Shargel, would you like to call any

13    witnesses?

14         MR. SHARGEL:  Yes.  But with the Court's permission,

15    Mr. Mazer would like to use the facilities if that's all right.

16         THE COURT:  We'll take a five-minute break.

17         (Recess)

18         MR. SHARGEL:  May I proceed, your Honor?

19         THE COURT:  Yes.

20         MR. SHARGEL:  At this time the defense calls

21    Mr. Mazer.

22         THE COURT:  Mr. Mazer would you take the stand.

23      MARK MAZER,

24        called as a witness by the Defendant,

25        having been duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7m9mazh                    Gigante - cross

1          THE COURT:  You can inquire Mr. Shargel.

2    DIRECT EXAMINATION

3    BY MR. SHARGEL:

4    Q.  Mr. Mazer, where were you born?

5    A.  I was born in Ukraine.

6    Q.  And are you a naturalized American citizen?

7    A.  Yes, I am.

8    Q.  How long are you in this country?

9    A.  Thirty-something years.

10   Q.  Give us a little bit about your educational background.

11   A.  I have a master's degree in management information systems,

12   and I have bachelor's degree in computer science.

13   Q.  Let me direct your attention to the morning of December 15,

14   2010.  Now just as a preliminary matter you submitted an

15   affidavit in connection with this case?

16   A.  Yes, I did.

17   Q.  And you knew that the affidavit was in connection with this

18   motion to suppress.  You knew that, correct?

19   A.  Yes.

20   Q.  I'm going to show you what I'll mark --

21          MR. SHARGEL:  Actually it's in the record as a

22   document submitted on Mr. Mazer's behalf, your Honor.  For

23   purposes of the hearing I'll mark it as Defense Exhibit D for

24   identification.

25   Q.  Show you what's been marked as Defense Exhibit D for

D7m9mazh                          Mazer - direct

1    identification.  I ask if you recognize it.

2    A.  Yes, I do.

3    Q.  What do you recognize it to be?

4    A.  It's affidavit.

5              MR. SHARGEL:  I offer it.

6              MR. MASTER:  No objection.

7              THE COURT:  It will be admitted into evidence as

8    Defense Exhibit D.

9              (Defendant's Exhibit  D received in evidence)

10             MR. SHARGEL:  The only reason I'm offering it, your

11   Honor, is -- I'll ask this question of the witness.

12   Q.  Do you see the date on the very first line that says you

13   were arrested on December 17, 2010?

14   A.  Yes, I do.

15   Q.  Was that anything more than a typographical error?

16   A.  No, it was not.

17   Q.  It was an error that was not committed by you, right?

18   A.  Yes.

19             MR. SHARGEL:  May I continue, your Honor?

20             THE COURT:  Yes.

21   Q.  I'm directing your attention to the morning of December 15,

22   2010.  And I'm going to ask you where you were -- I'm going to

23   pick a time, 6:00 early in the morning.  Where were you?

24   A.  I was sleeping in my bedroom in my house at 59 Harrow Lane,

25   Manhasset.

1  Q.  Who else was in the house that night?

2  A.  It was my wife, who was sleeping with me, and three of my

3  children.

4  Q.  That's your primary residence at the time, right?

5  A.  Yes.

6  Q.  And tell us the ages of your children, if you could do the

7  math, tell us how old they were in December of '10.

8  A.  My daughter was 21.  My son was 18.  And my youngest son

9  was 10.

10  Q.  And were they sleeping or awake at that hour?

11  A.  They were asleep.  We all were asleep.

12  Q.  Does there come a time when you hear, just to focus your

13  attention, does there come a time when you hear a knock at the

14  door or a bell that's rung?

15  A.  I didn't hear the knock.  I heard the intercom bell on the

16  door which woke me up around 6:15.

17  Q.  Tell us what the intercom system, what security system you

18  have.

19  A.  Intercom is not a security system.  It's basically

20  telephone.  When you pick up the phone off the wall the video

21  camera activates and able to see who was standing outside on

22  the other side of the door.

23  Q.  And on that December morning could you tell us who you saw

24  on the outside?

25  A.  At 6:15 when I was awaken by the bell I got up, I put my

D7m9mazh                     Mazer - direct

1   pajama pants and a T-shirt and I take off the intercom and I

2   saw several officers standing outside with a badge around their

3   neck that's clearly displayed.  And I ask can I help you.  And

4   they said Mr. Mazer we need to speak with you.  Please open the

5   door.

6   Q.  And what did you do next?

7   A.  I went downstairs and I opened the door.

8   Q.  When you went downstairs and opened the door what were you

9   wearing?

10  A.  I was wearing my pajama pants and a T-shirt.

11  Q.  And when you opened the door how many people entered?

12  A.  Many.

13  Q.  Well --

14  A.  There were four people walking -- three people that I saw.

15  Many people that were behind them.  I didn't count exactly the

16  number but there were plenty.

17  Q.  Were they wearing any type of particular garb that you

18  noticed?

19  A.  They were wearing some blue jackets with some white

20  signatures on them and I saw the badges around their necks and

21  the belts and I saw the guns displayed in the holsters and to

22  me it was clearly they were law enforcement officers.

23  Q.  When you say displayed, were there any guns out of the

24  holsters?

25  A.  No.  But they were clearly visible.

D7m9mazh                          Mazer - direct

1    Q.  And what happened next?

2    A.  Deputy commissioner Sullivan, if that's the name, he said

3    that he would like to talk to me and he would like to discuss

4    with me serious matters.

5    Q.  And before deputy commissioner Sullivan said that, did

6    agents go throughout the house to secure the house?

7    A.  No.

8    Q.  Did any agents go to the second floor?

9    A.  No.

10   Q.  And did you --

11   A.  They went to the second floor.  When they told me they

12   would like to speak to me, I told them I need get dressed and

13   wash my face.  As I was walking upstairs agents were pouring

14   into the house and spreading along the first floor.

15   Q.  When you went upstairs, who accompanied you?

16   A.  Gentleman that was standing here before me, before me,

17   Mr. Gigante.

18   Q.  Mr. Gigante?

19   A.  Yes.  I asked him to go upstairs and change, go to the

20   bathroom and wash my face.  I was told I can do that as long as

21   he's accompanying me and I cannot do it by myself.  He has to

22   come with me.

23        As I went upstairs to the bathroom there is a small

24   room where I have a toilet and I wanted to use the toilet and I

25   wanted to close the door.  And Mr. Gigante told me that I

D7m9mazh                          Mazer - direct

1   cannot close the door and I have to do whatever I have to do in

2   front of him.  So he was standing in the doorway and observing

3   me going to the bathroom.

4           And after that I went in to the sink.  I washed my

5   hands.  I brushed my teeth.  I washed my face.  And I comb my

6   hair.  After that I use my towel, wipe my face and everything

7   else.  And I went to the dressing area and I selected the

8   clothes that I will be wearing.  And I put my pants, I put the

9   shirt, and I buttoned all the buttons and zip all the zippers,

10  and I went downstairs.  It took approximately ten minutes, give

11  or take.

12  Q.  So what's your best recollection as you sit here now of how

13  long, what time it was when you arrived at that table?

14  A.  6:32, 6:33.  As soon as I arrived I asked if anybody would

15  like coffee because I wanted to have coffee.  I cannot function

16  without drinking coffee in the morning.

17  Q.  So what happened next?

18  A.  Before I even sit down at the table I asked for permission

19  to get coffee.  So they gave me permission to get coffee and

20  they told me nobody wanted any coffee at all.  So I went to get

21  the coffee myself.  Mr. Gigante was following me to the

22  kitchen.  I went to the kitchen and I --

23          MR. SHARGEL:  Could you slow down a little bit.  Just,

24  please.  Slow down a bit.

25  Q.  You had offered the other agents coffee; is that right?

D7m9mazh                          Mazer - direct

1    A.  Yes.

2    Q.  And you're permitted, as Mr. Gigante testified, you're

3    permitted to make yourself a cup of coffee?

4    A.  Yes so long as he was standing next to me.

5    Q.  How long did that process take to make the cup of coffee?

6    A.  Seven minutes.

7    Q.  And how do you recall that?

8    A.  When we went into the kitchen, when I came from upstairs

9    downstairs and I didn't sit down at the table I asked for the

10   coffee.  They told me it's okay.  I went to the kitchen.  He

11   followed me.  I have two type of equipment in the kitchen.  And

12   I have automated machine and I have electrical coffee --

13   electrical pot.  I took the pot off the electrical base and I

14   poured the water in.  And it's a minute per cup.  So I poured

15   the full bucket.  And I put it up.  And I turned it on.  And it

16   takes six minutes, give or take, a little bit more, six minutes

17   to boil the water.  While the water was boiling I was getting

18   the cup, putting the instant coffee in, sugar, and I was

19   waiting for the water to finish boiling.

20         Once it boiled I poured the cup in -- the water into

21   the cup and I twisted the spoon.  At that time I offered the

22   officers coffee again.  Maybe they changed their mind.  And

23   Mr. Gigante asked me, you know, what is this next to the coffee

24   pot.  And I said to him it's a coffee machine.  But I didn't

25   want to use at that time.  And I said to him it's -- you know

1    you press the button you get the coffee.  But it wasn't used

2    because we didn't have coffee beans at that time.  We had

3    instant coffee.

4    Q.  So coffee, however you got it, you got the coffee and what

5    do you do next?

6    A.  I took the cup of coffee with me to the table.

7    Approximately 6:37, 6:40 I sit down, I'm comfortable.  And

8    Mr. Sullivan began his speech -- not the speech but you know

9    began his -- began speaking, that's what would be correct.

10   Mr. Sullivan began speaking.  He explained to me --

11   Q.  Let me ask you this.  Did you know Mr. Sullivan before that

12   day?

13   A.  No.

14   Q.  Now tell us as best you can recall, please tell the Court

15   as best you can recall what the conversation was between you

16   and Mr. Sullivan.  Who said what to whom?

17   A.  As I was sitting at the table there were several officers

18   sitting around the table.  Mr. Sullivan was on my left.  And a

19   couple others were sitting around.  And he began talking and he

20   try -- you know he presented to me the case that this is a

21   serious matter.  New York City department of investigation

22   conducting extensive investigation of City Time project and

23   they would like to get my cooperation to help them to develop

24   the case against the city officials and as well as he was

25   continually telling me the steps that they were going through,

1    or they went through.  They interview all the consultants that

2    were prior on the project, after the project, you know, before

3    the project -- I'm sorry.

4            That they were interviewing consultants on the project

5    that were -- left the project and different kind of consultants

6    that were working currently on the project.  At the same time

7    he told me they interview city officials, OPA officials

8    specifically.  And they interview a lot of people he started

9    mentioning, you know, that they need my assistance.  I was

10   sitting there listening.  I wasn't saying a word.  He was going

11   through -- you know he pulled out the chart.

12   Q.  Tell us about that.

13   A.  He, he --

14   Q.  Excuse me.  Let me ask the question.  We're not in a rush.

15   So just be calm.  At what point does he pull out the chart?

16   A.  Probably fifteen minutes into conversation, into his

17   presentation to me.

18           He was presenting me the case.  He was presenting me

19   the investigation that they -- he outlined the investigation

20   they went through and they needed my assistance to take it to

21   the next level.  And the -- I was listening and I wasn't

22   responding to anything.  And he pulled out the chart in

23   questioning which presented the schematic, you know, SIC New

24   York City, SIC TechnoDyne, SGM, corporations and the whole flow

25   of information as they developed.  And he asked me to validate

D7m9mazh                    Mazer - direct

1   if this is true or not.  I never see the chart before in my

2   life, so.

3   Q.  Did you ever see it again?

4   A.  Yes.  I saw it the following day when the -- on December 16

5   when I came home after the arrest, the following morning, and

6   the 16th, 17th, to the best of my recollection.  It's

7   available on the internet with the U.S. Attorney's Office

8   presentation when they were doing it, basically displaying how

9   the money were spent and how the city was defrauded and what

10  role I play in this alleged conspiracy.

11  Q.  How long was it that you were at that table?

12  A.  (No response).

13  Q.  How long -- how much time was spent at that table?

14  A.  From the time I arrived?

15  Q.  Yes.

16  A.  Hour and ten minutes.

17  Q.  When Mr. Sullivan was making his, as you say, speech to you

18  about cooperation, was he asking any questions at that point?

19  A.  No.  He was presenting his proposals and he was offering me

20  to cooperate.  And they make it clear that if I cooperate with

21  them they will not hurt my family.  They will not arrest my

22  wife.  They will not arrest my mother.  They will not arrest my

23  uncle.  And I was listening.

24  Q.  And when Mr. Gardella spoke to you, how long approximately

25  was that conversation?

1        Not conversation but as he called it when he was here,
2    the crossroads speech?
3    A.  Mr. Sullivan conversation, proposal, description took
4    probably, give or take, 30 minutes.  After which point
5    Mr. Gardella give what he called, I remember, last time he was
6    here that it was a crossroads speech.  It was a short and
7    basically he said to me we already know everything we need to
8    know.  We just need you to confirm it and give us city
9    officials.  And his speech went on another five, seven minutes.
10   Q.  So how long altogether were you at that table?
11   A.  I arrived at the table 6:40.  And we left the house very
12   quickly at 7:50.
13   Q.  Now you recall -- you were sitting here when Mr. Gigante
14   was saying that the reason that -- one reason why they didn't
15   leave until 7:50 was because arrangements had to be made for
16   the children, right?
17   A.  Yes.
18   Q.  At that time was your 21-year-old daughter fully capable of
19   taking care of the -- of Michael who was ten?
20   A.  Alex.
21   Q.  Alex who was ten?
22   A.  Yes.
23   Q.  And you had Michael who was at the time 18?
24   A.  That's correct.
25   Q.  And he was fully self-sufficient?

1   A.  Yes, he was.

2   Q.  Both your daughter and your son Michael had taken care of

3   Alex many times in the past?  Is that a fair statement?

4   A.  That's correct.

5   Q.  Did anyone -- did either you or your wife express to the

6   agents that you couldn't leave the house until arrangements had

7   been made for the children, quote unquote?

8   A.  No, we did not.

9   Q.  Did there come a time when you said to the -- to

10  Mr. Gardella and Mr. Gigante, Well take me away?

11  A.  It was the end.  It was anywhere around 7:47, 7:45, 47,

12  something like that.

13  Q.  This conversation -- withdraw conversation.  But this

14  dialogue -- I'm going to withdraw that one too.  Too similar to

15  conversation.

16          The bottomline is you're being pitched for cooperation

17  the entire time you're at the table; is that correct?

18  A.  That's correct.  Extensively.

19  Q.  Sir, you understand that you're under oath, right?

20  A.  That's correct.

21  Q.  You understand the United States Sentencing Guidelines?

22  They've been explained to you, right?

23  A.  Yes, I do.

24  Q.  Do you -- and in that context let me put this question to

25  you.  Were you ever given Miranda warnings at 6:30 in the

D7m9mazh                          Mazer - direct

1    morning?

2    A.  No, I was not.  I was not even downstairs at 6:30.

3    Q.  And were you given Miranda warnings at any time that

4    morning?

5    A.  No, I was not.

6            MR. SHARGEL:  I have no further questions.

7            THE COURT:  Cross-examination.

8            MR. MASTER:  Yes, your Honor.

9    CROSS-EXAMINATION

10   BY MR. MASTER:

11   Q.  Now, Mr. Mazer you recognize me, don't you?

12   A.  Yes, I do.

13   Q.  I'm one of the prosecutors on this case.  You're familiar

14   with that, correct?

15   A.  Yes.

16   Q.  And on September 30 of this year you are going to be going

17   to trial, correct?

18   A.  Yes.

19   Q.  You're going to be sitting at that table, correct?

20   A.  Yes.

21   Q.  And I and other members of the government's team will be

22   sitting at that table, correct?

23   A.  Yes.

24   Q.  Now you don't want to be convicted at that trial, do you?

25   A.  I hope not.

91

D7m9mazh                    Mazer - cross

1   Q.  Right.  You don't want to be convicted, do you?

2   A.  That's correct.

3   Q.  And you don't want the statements that you made to

4   investigators the morning of your arrest admitted at that

5   trial, do you?

6   A.  No.

7   Q.  That's because the statements are so devastating to your

8   defense; isn't that right?

9              MR. SHARGEL:  Object to the form of the question.

10             THE COURT:  Sustained as to the form.

11  Q.  Well, the statements that you made to officers when you

12  were arrested, that's not consistent with your defense, is it?

13             MR. SHARGEL:  Objection.

14             THE COURT:  I'm going to sustain the objection.  Going

15  too far.

16  Q.  Well, fair to say that you lied a number of times to agents

17  when you were arrested?

18             MR. SHARGEL:  Judge, I'm going to object to this.

19  It's not the substance.  This is a claim -- this is a

20  contention that there were no Miranda warnings given.  So to

21  cross-examine on the actual questions I think is beyond the

22  scope.  I think that courts have consistently held that it's

23  not a question of the answers that were given, the statements

24  that were made.  It's a question --

25             THE COURT:  I'm going to overrule the objection and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7m9mazh                        Mazer - cross

1    primarily because I don't remember this -- this witness has not

2    said he made any statements so it's still an issue of fact as

3    to whether he made any statement -- he claims any statements

4    that should be suppressed because he wasn't given Miranda

5    warnings.  But I heard his testimony about the questions and

6    speeches.  But he never said he made any statement.  So I think

7    that you opened the door as to what he was asked and what the

8    speeches were.  I think it's appropriate for the government to

9    ask him what, in fact, happened between him and the witness --

10   and the agents.

11            You can continue.

12   BY MR. MASTER:

13   Q.  You made a number of statements in response to questions

14   that the agents asked you, didn't you?

15   A.  After Mr. Sullivan finished his presentation to me, and

16   Mr. -- I don't remember the name -- the first person that was

17   interviewed here, give me what are called crossroads speech,

18   then the questions began around 7:10, 7:15.  And to the best of

19   my recollection I answered no to each and every question.

20   Q.  So you do remember asking questions and giving responses?

21            MR. SHARGEL:  I object to the form.  He wasn't asking

22   questions.

23            THE COURT:  Why don't you restate the question.

24   BY MR. MASTER:

25   Q.  You remember being asked questions and answering no to

D7m9mazh                    Mazer - cross

1   those questions?

2   A.  Yes, to the best of my recollection, to all the questions.

3   Q.  Well do you remember being asked about companies owned by

4   your mother?

5   A.  I don't remember exact questions.  The only thing I was

6   answering at that time was no to all the questions.  To the

7   best of my recollection.  I don't remember specific questions

8   at this point.

9   Q.  Well this is a specific question, sir.  Do you remember

10  being asked about questions owned -- about companies owned by

11  your mother?  Yes or no.

12  A.  Yes.

13  Q.  And do you remember stating that you did not know about

14  your mother's businesses?

15  A.  The question was do I know my mother.  The answer was no.

16  Do you want -- the second question was do you know your

17  mother's businesses.  The answer was no.  It was no to all the

18  questions that were asked of me at that time.

19  Q.  Do you remember being asked whether you received any money

20  from your mother's businesses?

21  A.  I don't remember.

22  Q.  You don't remember being asked that?

23         Do you remember saying in response that your mother's

24  money is hers and you have nothing to do with it?

25  A.  I don't remember at the moment specific questions and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7m9mazh                          Mazer - cross

1   answers.  I remember answering no to all the questions.

2   Q.  You don't remember those questions?

3   A.  Not at the moment.

4   Q.  Well, if you -- you said you answered no to the question

5   about your mother's businesses not knowing your mother's

6   businesses.  Do you remember just saying that?

7   A.  Yes.

8   Q.  And that's -- that answer, the one that you just admitted

9   giving, that statement is a lie; isn't that right?

10         MR. SHARGEL:  Judge, I object to that.  I object to

11  this cross-examination on those statements.

12         THE COURT:  No.  Overruled.  I think on the issue,

13  particularly the issue before me is the credibility of

14  witnesses who testified about what occurred.  I think this goes

15  directly to this witness's credibility.

16         You can answer.

17         THE WITNESS:  I answered no to all the questions -- to

18  that question and the reason I answered no because I was

19  overwhelmed at that time after 15 minutes of speeches and

20  conversations.

21  Q.  We'll get to the timing in a minute, Mr. Mazer.  That's not

22  the question that I asked.

23         I asked whether that statement, as you sit here today,

24  you know that that statement is a lie; isn't that right?

25  A.  Yes.

1   Q.  That's because you set up those businesses in your mother's

2   name, right?

3          MR. SHARGEL:  Judge, I must object to this.  He's

4   using this as discovery.  This is beyond the scope of the

5   hearing, most respectfully.

6          THE COURT:  Mr. Shargel, I don't want to cut you off

7   but I'm going to rule in your favor, so if you want to keep

8   talking --

9          MR. SHARGEL:  I better stop talking.

10          THE COURT:  Sustained as to that question.

11          MR. MASTER:  All right.

12   Q.  Well, you were also asked who Dimitry Aronshtein was?

13          MR. MASTER:  Your Honor, just for a moment, if I can

14   understand the contours of your Honor's ruling.  I'm permitted

15   to inquire as to whether he recalls making certain statements

16   and then whether those statements were lies?

17          THE COURT:  You can ask him what he was asked.  And

18   you can ask him what he said.  And you can ask him whether what

19   he responded was true or false.

20          MR. MASTER:  Okay.

21   Q.  You were asked, you remember being asked who Dimitry

22   Aronshtein was?

23   A.  Yes.

24   Q.  And do you remember saying no to that question?

25   A.  Yes.

D7m9mazh                         Mazer - cross

1   Q.   And that statement also was a lie; isn't that right?

2   A.   Yes.

3   Q.   And you remember being asked whether you received any money

4   from your mother's companies?

5   A.   I don't remember exactly number of questions that were

6   asked, specific questions.  I don't remember.

7          I remember clearly was asking if I knew who my mother

8   was.  And I was asked if I knew who my uncle was.  And I was

9   asked if I knew who my wife's cousin was.  And the answer to

10  all these questions were no.

11  Q.   So, okay.  Just to cut to the chase.  You said you didn't

12  know -- your cousin is Anna Makovetskaya, right?

13  A.   My wife's cousin.

14  Q.   You said you didn't know who she was?

15  A.   That's correct.

16  Q.   That was also a lie?

17  A.   As you put it.

18  Q.   I --

19  A.   Yes.

20  Q.   It's a yes-or-no question.

21  A.   Yes.

22  Q.   And you were also asked if you knew Victor Nantanzon.  Do

23  you remember that?

24  A.   No.

25  Q.   Well in preparation for your testimony here today did you

97

D7m9mazh                         Mazer - cross

1    have the opportunity to review this memorandum that was

2    prepared by inspector general Gigante?

3    A.  Yes.

4    Q.  And he certainly wrote down that you were asked if you knew

5    Victor Nantanzon.  Do you see that in the memo?

6    A.  I don't have anything in front of me.

7    Q.  Well it should be in front of you.

8             MR. MASTER:  May I approach, your Honor?

9             THE COURT:  Yes.

10   Q.  It's marked as 3501A, second page.

11   A.  What's the question?

12   Q.  Do you remember, having reviewed that, do you remember

13   being asked if you knew Victor Nantanzon?

14   A.  I remember -- reviewed this.  The answer is yes to the

15   question that I saw these statements in preparation for this

16   hearing.  I don't remember the question that was asked me at

17   the time of the arrest.

18   Q.  You don't remember being asked anything about Victor

19   Nantanzon?

20   A.  No.

21   Q.  You don't remember being asked anything about Prime View?

22   A.  To the best of my recollection right now the answer is no.

23   Q.  You don't remember being asked anything about D.A.

24   Solutions?

25   A.  I remember being asked about D.A. Solutions.  It was on the

1   chart that was presented to me.

2   Q.  And do you remember what you said when you were asked about

3   D.A. Solutions?

4   A.  No.

5   Q.  You said you did not know about D.A. Solutions?

6   A.  That's correct.

7   Q.  And that was a lie?

8   A.  That was the answer I gave.

9   Q.  Right.  But that was a lie?

10  A.  Yes.

11  Q.  Now let's get back to the events of that morning.

12          You, sir, you testified just now on direct examination

13  about a sequence of events.  Do you remember that?

14  A.  Yes.

15  Q.  And that testimony, as your counsel elicited, was under

16  oath, correct?

17  A.  Yes.

18  Q.  And the oath was made under penalties of perjury.  Do you

19  understand that?

20  A.  Yes.

21  Q.  Do you understand you could be prosecuted separately for

22  perjury for making -- for intentionally lying here?

23  A.  That's correct.

24  Q.  Do you remember that?

25          Now you also have Defense Exhibit D.  Do you have that

D7m9mazh                    Mazer - cross

1   in front of you?  That's your affidavit.

2   A.  No, I don't.

3   Q.  I'm going to show you -- government had marked as

4   Government Exhibit 3, but we're marking it also as Defense

5   Exhibit D.

6           Now, that's the affidavit that you submitted in order

7   to get this hearing today, correct?

8   A.  Yes.

9   Q.  And it states at the beginning, the first page it says,

10  "Mark Mazer being duly sworn."

11          Do you remember reading that before you signed it?

12  A.  Yes.

13  Q.  And if you turn to the last page, just to make clear,

14  that's page three.  There's a signature on the back.  Whose

15  signature is that?

16  A.  Mine.

17  Q.  You signed it and you swore before you signed it.  And in

18  connection with signing it, you swore that what was in here was

19  true?

20  A.  That's correct.

21  Q.  Right?  Nothing was left out, right?

22  A.  The affidavit was prepared by my lawyers.

23  Q.  Right.  But before you signed it, setting aside the issue

24  of this December 15 versus December 17 typographical error,

25  before you signed it, you looked it over, right?

D7m9mazh                        Mazer - cross

1   A.  That's correct.

2   Q.  And you wanted to make sure that what you said in this

3   affidavit was accurate to the best of your recollection at that

4   time?

5   A.  That's correct.

6   Q.  And that was dated May 13, 2013?  Do you see that?

7   A.  Yes.

8   Q.  Just about two months ago?

9   A.  (No response).

10  Q.  Right?

11  A.  Yes.

12  Q.  Sir, just two months ago you didn't testify -- you didn't

13  say in this affidavit that you went and put on clothes for ten

14  minutes; isn't that right?

15  A.  This is a description that was put together based on the

16  interview that my lawyers conducted with me.

17  Q.  That's not my question, sir.  That's not my question.

18  Listen to my question.

19          Just two months ago -- just turn to paragraph four.

20  Two months ago you said you went upstairs, you used the toilet,

21  you washed your hands and face, and then you said when I was

22  done the officer followed me downstairs.

23          Do you remember that?  Do you see that right there?

24  A.  Which part?

25  Q.  Paragraph 4.

D7m9mazh                        Mazer - cross

1    A.  That's correct.

2    Q.  You swore that -- at the time you swore that that was true,

3    right?

4    A.  That's correct.  We came downstairs.

5    Q.  You don't have clothes in the bathroom, do you?

6    A.  No.  I have in clothes as you walked into the bathroom,

7    outside the bathroom.

8    Q.  When you were done using the bathroom, you went right back

9    downstairs; isn't that right?

10   A.  No.  Mr. Gigante testified here in front of us today that I

11   washed my face.  And before that I brushed my teeth.  And

12   before that I -- after that I combed myself, and that's what we

13   did.  That's what I said.  And that's what he said.  And that's

14   what happened.

15   Q.  And then you went right back downstairs?

16   A.  That's correct.

17   Q.  And when you were back downstairs you went over to the

18   dining room table, right?

19   A.  That's correct.

20   Q.  And, sir, you testified about some coffee system that you

21   possess.  You do have a push button coffee machine, right?

22   A.  That's correct.

23   Q.  And all you have to do is push a button and coffee comes

24   right out?

25   A.  When it's working, that's correct.

D7m9mazh                    Mazer - cross

1    Q.  And so after you were done making coffee, you sat down at
2    the table?
3    A.  That's correct.  Not from the push button machine but
4    that's correct.
5    Q.  And as you just testified, you had time to compose
6    yourself, right?
7    A.  Clarify your question.  What does it mean compose yourself.
8    Q.  Well, you were able to wash your face and use the bathroom,
9    right?
10   A.  Yes.
11   Q.  You had -- you were allowed to make a cup of coffee, right?
12   A.  Right.
13   Q.  And you were allowed to sit down with -- you weren't
14   wearing handcuffs, right?
15   A.  Right.
16   Q.  And you had time to compose your thoughts and lie to those
17   officers when they asked you questions?
18   A.  From the time the officers followed me upstairs and I went
19   to the bathroom and I was not able to close the door, it was
20   clear to me that I was in custody.  And I was not able to
21   free -- I was not able to leave the house and free to do the
22   things I need to do because Mr. Gigante was standing next to
23   me.
24   Q.  That's not the question that I asked, sir.
25           You had time to sit down at the dining table with your

1   cup of coffee, start drinking that coffee before you were ever

2   asked any questions, right?

3   A.   That's correct.

4   Q.   And you had time in your mind to process what they were

5   asking you.  And as a result of that process, at least some of

6   the time, you produced lies?

7   A.   As I stated before, the questions were not asked initially.

8   It was Mr. Sullivan conversation for 30-something minutes and

9   then crossroads speech by another officer and then the

10  questioning began.

11  Q.   That wasn't my question, sir.  I'll ask one more time.

12         You had time to process the questions in your mind and

13  at least some of the time, the answers to those questions, you

14  had time to process them, and you made the conscious decision

15  to lie, correct?

16  A.   I answered no.

17  Q.   Again, sir, do you not understand my questions?

18         I'm trying to be clear.

19  A.   Can you try again, please.

20  Q.   You had time when you were sitting down there with your cup

21  of coffee to hear their questions -- you're not hard of

22  hearing, correct?

23  A.   That's correct.

24  Q.   You had time to understand their questions, correct?

25  A.   Yes.

D7m9mazh                    Mazer - cross

1   Q.  You had time to think about how to respond to those

2   questions?

3   A.  That's correct.

4   Q.  And on at least some occasions you had time to decide how

5   to answer and to decide to answer with lies, correct?

6   A.  No.

7   Q.  Well --

8   A.  At the time of the questioning I was overwhelmed and I

9   couldn't remember hearing a lot of these questions and the

10  answer was no to all the questions.

11  Q.  Sir, you just testified less than a minute ago that you had

12  time to hear the questions and you had time to listen to the

13  questions and you had time to understand the questions.

14          Do you remember just testifying about that?

15  A.  Yes.

16  Q.  And you said, you just said yes to each of those questions.

17  Do you remember just saying that?

18  A.  Yes.

19  Q.  And do you remember just saying a few minutes before that,

20  that your answers to several of those questions were no and

21  those questions were knowingly false, the answers were

22  knowingly false?  You knew that you were lying to the agents

23  who were right there?

24  A.  I was overwhelmed when the answer was no.

25  Q.  You were knowingly lying to the agents when the answer was

1    no?

2    A.   (No response).

3    Q.   Correct?

4    A.   As I stated before, after 50 minutes of conversation I was

5    overwhelmed and the answer was no to all those questions.

6         MR. MASTER:  Your Honor, I'll move on.

7    Q.   Sir, this isn't the first time -- well, you had to lie

8    repeatedly in order to commit the offenses with which you're

9    charged; isn't that right?

10        MR. SHARGEL:  I object to that.

11        THE COURT:  I'm going to sustain.

12        MR. MASTER:  Your Honor, I have -- I'd like to show

13   the witness what's been marked for identification as Government

14   Exhibit 5.

15        I'd like to show the defendant something that he swore

16   to under oath falsely.  That's within the core --

17        MR. SHARGEL:  I object to the speech also.

18        THE COURT:  I sustain the objection to the last

19   question.

20        Go on to the next question and maybe the next question

21   won't be objected to and I won't sustain the next question.

22        If you want to show him a document, you can show him a

23   document.  But simply asking him whether he had to repeatedly

24   lie when he committed this offense goes into other issues that

25   don't have anything to do with his credibility because that

D7m9mazh                    Mazer - cross

1    starts with the assumption that somehow he's going to -- well I

2    guess you expect him to break down and confess or something.  I

3    don't know what you expect him to say.

4            I sustain the objection to the last question.  If you

5    want to proceed in another manner and you have another

6    question, that's the nature of my --

7            MR. MASTER:  Yes, your Honor.

8    Q.  Are you familiar with something called VENDEX?

9    A.  Yes.

10   Q.  And you're familiar with VENDEX because -- because you

11   actually filled out a VENDEX questionnaire.  Do you remember

12   that?

13   A.  Yes.

14   Q.  You were a contractor for the city of New York, right?

15           MR. SHARGEL:  Judge I'm going to object to this and

16   I'd like to just tell you why.

17           THE COURT:  Okay.

18           MR. SHARGEL:  Judge, I objected consistently from the

19   beginning to going into the substance of this.  Now the

20   prosecutor is going into essentially a discovery mission to try

21   to find out what Mr. Mazer's position is on this.  The Supreme

22   Court has made it clear that a defendant who is trying to

23   protect his Fourth Amendment rights can't surrender his Fifth

24   Amendment rights.  I think that all the lawyers in the

25   courtroom agree that that's the law.

D7m9mazh                        Mazer - cross

1           So what Mr. Master is doing is taking this opportunity

2     to go further and ask about other aspects of the case.  And if

3     that's the strategy of the prosecutor, a strategy that I've

4     never seen before, then I'm going to instruct the witness, I'm

5     going to instruct my client to assert his Fifth Amendment

6     privilege.  We can't have a situation where they're planning to

7     introduce at trial that Mr. Mazer admitted at a Fourth

8     Amendment hearing that he overwhelmed, as he's testified, that

9     he lied to the agents.  That's clearly not admissible.

10          It's clearly improper for them to now go further and

11    attempt to ask questions about other aspects of the case.

12    There's a count here that contains allegations about submitting

13    false VENDEX reports.  So he's supposed to be questioned about

14    that?  I don't think the law supports that.

15          I don't think that what he's testified to thus far is

16    admissible at his trial.  But beyond admissibility, on that

17    basic question, is the proposition that they're now taking an

18    opportunity to go on some discovery mission.  And that's simply

19    wrong.  And if that's what he's doing, then I'm going instruct

20    my client to assert his Fifth Amendment privilege.

21          THE COURT:  Mr. Master.

22          MR. MASTER:  Your Honor, this is not out of the realm

23    of what prosecution -- the prosecutors do.  This happens all

24    the time in court.  Mr. Mazer has placed his credibility at

25    issue by taking the stand and asking the Court to accept his

1    version of events as true.

2            Absolutely, as Mr. Shargel indicates, the law is that

3    generally statements made during pretrial hearings are not

4    admissible in the government's case in chief.  And that is the

5    protection that's available to Mr. Mazer.  I'm sure Mr. Shargel

6    is quite familiar with that.

7            How is a Court to assess the credibility of a

8    defendant if he can't be cross-examined like any other witness

9    as to his credibility which is at issue?

10           He's not shielded from questioning as to his

11   credibility.  That can't be the rule.  There are protections

12   procedurally for these statements not to be admitted in the

13   government's case in chief at trial and I can represent to the

14   Court that that's not what the government intends to do.  We're

15   here as part of a truth-seeking function and we're here to

16   determine whether this defendant is telling the truth right now

17   on the stand.

18           So, your Honor, I think it's quite clear that the

19   government is permitted to inquire as to matters that are

20   relevant to his credibility.

21           I respect the Court's ruling as to the scope of

22   cross-examination.  But we're prepared to inquire as to another

23   sworn writing in which the defendant did not -- under oath in

24   which the defendant made false statements.

25           MR. SHARGEL:  It's interesting that the government

D7m9mazh                    Mazer - cross

1    stands before you and tells you what the law is and what

2    happens in these cases without citing a single case or support

3    for this proposition.  What are we supposed to do with the

4    fruits or leads.  They're going to start getting into the

5    specific allegations of the indictment beyond anything that

6    we've talked about at the hearing, to get into the VENDEX, get

7    into other aspects of this and then take advantage of fruits

8    and leads.

9            I believe that this is clearly unconstitutional and

10   I'm going to instruct my client to assert his Fifth Amendment

11   privilege if this continues.

12           THE COURT:  Mr. Master, on the very limited issue of

13   cross-examination I will allow you to ask this witness about

14   any prior statement that this witness has made in which this

15   witness has on some prior occasion admitted that it was false

16   except I will not allow you, at this hearing, to simply ask

17   questions of this witness which are simply the elements of the

18   allegations of the government against this witness and which

19   the government has the burden to prove that at trial.

20           Just simply ask the witness whether any of the

21   allegations that the government has made against the defendant

22   are true or false.  That's not the purpose of this hearing.

23   Its probative value is far outweighed by its potential

24   prejudice to the defendant.  And I think it's beyond the

25   scope -- limited appropriate cross-examination with regard to

D7m9mazh                      Mazer - cross

1    his credibility.

2              To the extent that you have some statements that he

3    has made and indicated in the past that those statements were

4    false, then those statements are not simply the allegations of

5    the government that involve the charges in this case.  You can

6    pursue those.  But to the extent that they're simply the

7    allegations of the government that they have an independent

8    obligation to prove, that's not the appropriate -- this isn't

9    the appropriate place, time, or purpose for which the

10   government should put to him the government's allegations so he

11   can either deny or admit that what the government claims is

12   true in their criminal indictment is, in fact, true.

13             So I guess the best guidance I can give you is that

14   you should stay away from asking him about the statements or

15   activities that involve the allegations in this indictment that

16   the government must prove.

17             MR. MASTER:  Just a moment, your Honor.

18             (Pause)

19   Q.  On page three of this affidavit, sir, do you remember

20   reading and affirming that your attorney has described the

21   Miranda warnings?

22   A.  Yes.

23   Q.  You're very familiar with the Miranda warnings, aren't you?

24   A.  Yes.

25   Q.  You were familiar even before your attorney explained them

1   to you; isn't that right?

2   A.  No.

3   Q.  Well you've watched TV shows where Miranda rights were read

4   to people; isn't that right?

5   A.  Law & Order, yes, once in a while.

6   Q.  And you've seen the Miranda rights given on that show;

7   isn't that right?

8   A.  That's correct.

9   Q.  Now, do you remember shoplifting some caviar from a Costco?

10  A.  Can you repeat the question.

11  Q.  Do you remember shoplifting some caviar from a Costco?

12  A.  Yes.

13          MR. SHARGEL:  You know, I'm going to move to strike

14  and I'll tell you why, Judge.  What we're hearing is evidence

15  that might be admissible under 608(b).  But shoplifting is not

16  a crime of false statement or declaration.  I submit that under

17  608(b) it's inadmissible, plainly inadmissible.

18          THE COURT:  Little bit of a late objection.

19          MR. SHARGEL:  There is no jury here.  But that's my

20  objection.

21          By the way, all we have is the question.  I know there

22  was a --

23          THE COURT:  Well there was a long wait for you to

24  object.  But it didn't happen until after he gave the answer.

25          Mr. Master, where do you intend to go with shoplifting

D7m9mazh                          Mazer - cross

1    caviar?

2                MR. MASTER:  First of all 608(b) doesn't have to do

3    with false declarations.  It has to do with specific instances

4    of a defendant's conduct to attack or support the witness's

5    character for truthfulness.

6                THE COURT:  Just a second.  Relax.

7                Do you genuinely think that I will give significant

8    weight to an assessment of his credibility as a witness in this

9    hearing because he shoplifted a can of caviar?

10               MR. MASTER:  Well, there is one other point that I

11   intended to make.  And that is:  Sir, do you remember when you

12   were arrested for that, where were you working?

13               MR. SHARGEL:  Objection.

14               THE COURT:  Again, I don't -- I can't foresee the

15   relevance.  You have to give me the relevant question.

16   Q.  Well do you remember when you were arrested saying that you

17   were a computer programmer with MS Technology in Oceanside.

18               MR. SHARGEL:  I object to this.

19               THE COURT:  And the relevance of this question is.

20               MR. MASTER:  That was a lie.

21   Q.  That was a lie, wasn't it?

22               MR. SHARGEL:  I object.  I don't know what the good

23   faith basis for this is.  This is so far afield.  I object.

24   And I don't see the relevance.  I don't see how this is

25   relevant to credibility.  Unless we have a mini-trial.

1          THE COURT:  You know, I think it's a bit far afield at

2     this point, Mr. Master.  So I'm going to sustain the objection.

3          MR. MASTER:  Yes, your Honor.

4          Just a moment.

5          (Pause)

6          MR. MASTER:  Nothing further, your Honor.

7          THE COURT:  Any further questions, Mr. Shargel?

8          MR. SHARGEL:  Yes.

9     REDIRECT EXAMINATION

10    BY MR. SHARGEL:

11    Q.  Mr. Master asked you questions about your affidavit.  Do

12    you remember those questions?

13    A.  Yes.

14    Q.  And then he said that in this affidavit there is no mention

15    of you getting dressed, right?

16    A.  Yes.

17    Q.  And when you went down to that table and sat at that table,

18    were you dressed?

19    A.  Yes.

20    Q.  Did you sit there in pajamas?

21    A.  No.

22    Q.  Did you have pajamas on when you answered the door?

23    A.  Yes.

24    Q.  Were you brought to court and arraigned in pajamas?

25    A.  No.

1   Q.  Were you wearing clothes when you were brought to court?

2   A.  Yes.

3   Q.  And when did you put those clothes on?

4   A.  After finished going to the bathroom, toilet, washing my

5   face and brushing my teeth, and then I put my clothes on,

6   before I came down.

7   Q.  So when you sat at the table you were fully clothed,

8   correct?

9   A.  That's correct.

10  Q.  Now you were asked a whole lot of questions about answers

11  that you gave and you told us that the answers were no to the

12  questions that you were asked, right?

13  A.  Yes.

14  Q.  And you were asked by Mr. Master, isn't it true that in

15  response to a question you told a lie, right?

16  A.  Yes.

17  Q.  He said that several times, didn't he?

18  A.  Yes.

19  Q.  The people from the department of investigation,

20  Mr. Sullivan and the others who were there that day and who sat

21  at that table, they told you you were in a lot of trouble,

22  right?

23  A.  Yes.

24  Q.  They told you that you could go to prison for a very long

25  time, right?

D7m9mazh                    Mazer - redirect

1   A.  Yes.

2   Q.  Now, they told you also -- and we had this before -- that

3   your mother would be arrested, right?

4   A.  That's correct.

5   Q.  How old is your mother?

6   A.  (No response).

7   Q.  She won't mind if you tell us the answer.

8          Give us an approximate age.

9   A.  One second.  I'm doing my math.

10          Seventy.  Less than.

11  Q.  Seventy?

12  A.  She was born in 1945.

13  Q.  You know that for a fact?

14  A.  Yes.

15  Q.  And your mother is in perfect health?

16  A.  No.

17  Q.  Tell us about the illnesses from which she suffers.

18  A.  She is cancer survivor.

19  Q.  And --

20  A.  Breast cancer.

21  Q.  And you were told that your uncle was going to be arrested,

22  right?

23  A.  Yes.

24  Q.  You were told that your wife's cousin was going to be

25  arrested?

1    A.  Yes.

2    Q.  And do you remember being asked the question by Mr. Master

3    about whether you were composed?

4    A.  Yes.

5    Q.  And let me put a different meaning on that.  Were you

6    relaxed at that point?

7    A.  No.

8    Q.  You were asked by Mr. Master whether you knowingly and

9    intentionally told a lie, right?

10   A.  Yes.

11   Q.  Could you describe what your own mental state was when you

12   sat there at that table being accused by those public

13   officials, being accused by a deputy commissioner of the

14   department of investigation and representatives of the United

15   States Attorney's Office, can you tell the Court what was going

16   through your mind and what fears you had.

17   A.  I was overwhelmed beyond belief.  And I was frightened.  I

18   was afraid about my mother.  I was afraid about my wife.  I was

19   afraid about myself.  I was afraid about everybody.  They asked

20   me to tell them who I paid bribes to.  And I told them I did

21   not pay any bribes.  And when they finished their convincing

22   crossroads speech I told them I don't have anything to add.

23   I'm not going to agree to testify and come up with stories that

24   never happened.  They didn't like that answer, so.

25   Q.  So when you sat there with those officers and agents that

1   day, were you making conscious decisions to lie?

2   A.  No.

3                MR. SHARGEL:  No further questions.

4                THE COURT:  Mr. Master, any further questions?

5                MR. MASTER:  Nothing further, your Honor.

6                THE COURT:  You can step down, sir.

7                (Witness excused)

8                Mr. Shargel, are you calling any further witnesses?

9                MR. SHARGEL:  No further witnesses.  And I rest.  And

10  what I'd like to do, with the Court's permission because of

11  the -- if I may, twists and turns of this hearing, I would like

12  to submit something in writing in very short order because I

13  want to submit something in writing not only on the factual

14  inconsistencies and improbabilities of the government witnesses

15  but the applicable case law in a hearing of this nature.

16               THE COURT:  When would you like to do that?

17               MR. SHARGEL:  I could do it -- I wish Evan were here

18  but he's busy having his baby.  So two weeks.  Could I have two

19  weeks?

20               THE COURT:  Can you do it by Friday, August 2?

21               MR. SHARGEL:  Yes.

22               THE COURT:  Government, how much time would you like

23  to respond?

24               MR. MASTER:  One week is fine, your Honor.

25               THE COURT:  Then let's say by August 9.

D7m9mazh

1          Are you going to be available that next week, the week

2   of say maybe August 14 so we can address the motion and I can

3   hear you further with regard to the other motion?  We still

4   have a motion outstanding.

5          MR. SHARGEL:  The 666 motion?

6          THE COURT:  Yes.

7          MR. SHARGEL:  I'm completely free on the 14th.

8          THE COURT:  What about 11:00 on the 14th we can

9   address the motions so we can move those out of here.

10          MR. SHARGEL:  That's fine, your Honor.

11          MR. MASTER:  Fine with the government.

12          THE COURT:  Then I'll see all the parties on the

13   14th of August at 11:00.  We'll resolve the outstanding

14   motions with regard to Mr. Mazer and then we can move forward

15   to the next date which is -- I think it's the pretrial

16   conference date for September 18.  So I'll see all the parties

17   then.

18          (Adjourned)

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                                  Page

3      ROBERT GIGANTE

4     Direct By Mr. Master . . . . . . . . . . . . .33

5     Cross By Mr. Shargel . . . . . . . . . . . . .48

6      MARK MAZER

7     Direct By Mr. Shargel  . . . . . . . . . . . .78

8     Cross By Mr. Master  . . . . . . . . . . . . .90

9     Redirect By Mr. Shargel  . . . . . . . . . . 113

10                        GOVERNMENT EXHIBITS

11    Exhibit No.                                  Received

12     3501A and 3501B   . . . . . . . . . . . . . .43

13                        DEFENDANT EXHIBITS

14    Exhibit No.                                  Received

15     A and B  . . . . . . . . . . . . . . . . . .47

16      D   . . . . . . . . . . . . . . . . . . . .79

17

18

19

20

21

22

23

24

25